[No. 18878.   Department One.   February 16, 1925.]

JOHN B. WRIGHT, *Respondent*, v. KATHERINE BROWN JOHANSON, *Appellant*.[1]

ATTORNEY AND CLIENT (16)—TERMINATION OF RELATION. Where an attorney was employed to go to Denver and commence work upon a case requiring immediate attention and to start upon notice to be given, he was, in effect, discharged by the failure to give notice to start and the employment of other attorneys within two months.

SAME (36, 41)—COMPENSATION—BREACH OF CONTRACT FOR CONTINGENT FEE—RECOVERY ON QUANTUM MERUIT. The measure of recovery, upon the discharge without cause of an attorney employed to conduct a case for a fee contingent upon success, is a *quantum meruit* for the services performed, although the case was successfully prosecuted by other attorneys.

LIMITATION OF ACTIONS (32)—ACCRUAL OF ACTION—ATTORNEY AND CLIENT—BREACH OF CONTRACT FOR SERVICES. Where an attorney, orally employed upon a contingent fee, is discharged before completion of his services, his cause of action accrues at the time of the discharge, and is barred within three years thereafter.

[1] Reported in 233 Pac. 16.

Appeal from a judgment of the superior court for King county, Tallman, J., entered May 27, 1924, upon the verdict of a jury rendered in favor of the plaintiff, in an action on contract. Reversed.

*Donworth, Todd & Higgins, Poe, Falknor, Falknor & Emory (Hyman Zettler,* of counsel), for appellant.

*Edward H. Judd* and *Edward H. Chavelle,* for respondent.

PARKER, J.—The plaintiff, Wright, commenced this action in the superior court for King county against the defendants, Katherine Brown Johanson and Elizabeth Brown Inglis, seeking recovery of compensation for services claimed to have been rendered by him as attorney at law for them upon a contingent fee contract. The case proceeded to trial as against the defendant Mrs. Johanson alone, which trial resulted in a verdict of a jury and a judgment rendered thereon awarding to Wright recovery as against her in the sum of $5,000, from which she has appealed to this court.

Counsel for Mrs. Johanson, by timely motions, moved the trial court for judgment of nonsuit in her favor, for a directed verdict in her favor, and for judgment in her favor notwithstanding the verdict. All of these motions were rested upon the ground, among others, that the evidence conclusively showed that Wright's cause of action was not commenced within the three-year limitation prescribed by law; that defense having been properly pleaded, as well as the defense that no contract was ever entered into by her with Wright for his services and that he never rendered any services to her. The overruling of these motions is claimed by counsel for Mrs. Johanson to have been erroneous. A painstaking examination of this record having convinced us that this claim of error must be sustained, the judgment of the trial

court reversed and final judgment rendered in favor of Mrs. Johanson, upon the ground that Wright's cause of action is conclusively shown to be barred by lapse of time, we find it unnecessary to consider other claims of error.

Mrs. Johanson and Mrs. Inglis are sisters. At the time of the alleged making of the contract with Mr. Wright for his legal services, they resided in Seattle; he also being a resident of Seattle and an attorney admitted to practice law in this state. Mrs. Johanson and Mrs. Inglis, with three brothers, constitute an older set of children of their father and their deceased mother. Their two half brothers and two half sisters constitute a younger set of children of their father and his second wife. The father, prior to the time of his decease, resided at Denver, Colorado, where he possessed property of large value. Prior to the decease of the father, as contended by the older set of children, he and his then second wife, the mother of the younger set of children, made mutual wills, each devising one-half of their property to the other and devising the other half of their property to all of the nine children in equal shares. This was in pursuance of an agreement between them to the end that all nine children would ultimately, upon the death of both, share equally in all their property, each will being made in consideration of the making of the other. The father died first, and thereupon one-half of the property, in due course of administration, went to his then wife, the mother of the younger set of children, and the other half in equal shares to all of the nine children. Thereafter the mother of the younger set of childred died, but her will could not be found. Mrs. Johanson and the others constituting the older set of children, therefore, found themselves under the necessity of establishing the will of their stepmother; also that

it had not been revoked by her, or of establishing and enforcing the mutual agreement under which the wills had been made, to the end that the property left by their stepmother be distributed to all of the nine children instead of it all being distributed to the four children of the younger set. The administration of that estate had proceeded in due course in the Colorado court having probate jurisdiction, to the stage when distribution of the property had been set for hearing on May 7, 1917. It had then become fully apparent that the younger set of children were going to claim the entire estate as heirs of their mother, and that they would refuse to recognize any will of their mother or any agreement between her and their father in the making of their mutual wills looking to the ultimate division of the property between all of the nine children in equal shares.

About April 14, 1917, a conference was held, at which there were present Wright, Mrs. Johanson, Dr. Johanson, her husband, and Mrs. Inglis. This conference was held in Seattle at the office of Dr. Johanson; Dr. Wood, a mutual friend, apparently having paved the way for such a conference looking to the employment of Wright. It was at this conference that Wright claims the contract for his services was entered into. No writing was made evidencing any such contract. It was wholly oral, if made at all. The evidence is in serious conflict touching the question of the meeting of the minds of the parties with reference to Wright's employment. However, we are here more particularly concerned with the question of the time of the making of any such contract and the time of the termination of Wright's employment thereunder. We shall let Wright give his own version of what occurred at this conference, another conference held a few days later, and some subsequent events, touching the question of

the time of the making of the contract, the rendering
of services by him in pursuance thereof, and his dis-
charge from such services by those he now claims
are bound to pay him therefor. He testified upon the
trial as follows:

"Through Dr. Wood I rang up Johanson, at Wood's
suggestion, and told Dr. Johanson that Dr. Wood had
said that he wanted to see me. Dr. Johanson told me
that he did want to see me and consult with me in re-
gard to a matter of an estate, and made an appoint-
ment with me. At that time I had never seen Dr.
Johanson, . . . Dr. Johanson made the appoint-
ment with me at his office, and when I went up there
Mrs. Johanson and Mrs. Inglis came in about three
minutes after I arrived at the office. They sat down;
and they discussed this case with me, Dr. Johanson,
Mrs. Inglis and Mrs. Johanson. . . . I told them I
thought I could win that case. I had in mind a case in
our supreme court. Then the question of services
came up, what it would cost them, and I told them I
would take it on a twenty-five per cent contingent fee.

.  .  .

"I told them I would take it on a twenty-five per
cent contingent fee, and either Mrs. Inglis or Mrs.
Johanson said, 'Then you don't get anything if you
lose,' and I said 'No.' We discussed the question of
costs of going to Denver. I told her the actual costs in
the case would just be the actual cost of going there
and getting these witnesses, and it would not be very
much. Dr. Johanson then discussed the question of
whether he would go or not, and so they said, 'Twenty-
five per cent,' and I said 'Yes.' They said 'You do not
get anything if you lose,' and I said 'No, I do not get
a cent, it is on a contingent fee.' One of them turned
to the other and said 'Is that satisfactory,' and she
said 'Yes.' . . .

"Dr. Johanson was very anxious to know how I was
·going to win it. I said 'Now, Dr. Johanson, if every-
thing is satisfactory, come down to my office, the three
of you, and I will explain the whole situation to you.

We will go over it and I will cite you the authorities.
. . .

"Afterwards Dr. Johanson and Mrs. Johanson came
down to my office. I had gathered a collection of the
authorities there at that time, and while they were
there I read them that case of *Prince vs. Prince,* [64
Wash. 552] to the two of them, and I consumed about
an hour in going over and explaining the whole situa-
tion to Dr. Johanson and his wife. . . .

"So he still couldn't make up his mind whether he
was going to Denver with me or not, and he said 'Well,
we will go home now and discuss this.' He said that
to his wife, and he also said 'I will be in tomorrow or
the day after.' I thought everything was all right.
. . .

"I asked them how about the distribution of this
estate, if they had made any application for a distri-
bution, and they told me . . . that the other heirs,
. . . were making an application to have the dis-
tribution come up in the near future. I understood
her to say it was next month, . . . I informed her
at that time that we would have to get there before
this distribution, that was all, I said 'We will have to
get our petition in there, and our claim, before the
final distribution, or we will not be in at all.' . . .

"After . . . I explained the whole situation to
them, everything was satisfactory. All I was waiting
for was the question of whether Dr. Johanson would
go with me to Denver or not. He said he would come in
the next day or the day after. I never heard from him,
and I rang up Mrs. Johanson on the telephone and
Mrs. Johanson told me that Dr. Johanson had gone to
Denver and would wire for me to go to Denver. I ex-
pected to receive that wire, and waited for another
week. I rang her up a second time, and Mrs. Johan-
son told me over the phone the second time that she
was sure that he would wire for me to go to Denver.
I waited for a considerable length of time and I phoned
her the third time, and she told me she did not under-
stand why he had not wired, but she was satisfied that
I would get a wire. In that time probably six weeks or

two months had elapsed, and I was satisfied that Dr. Johanson did not intend to send for me. . . .

"I never knew any of these parties—the only time I ever saw or talked with any of them was at the time—at their office and afterwards, Mrs. Johanson and Dr. Johanson at my office. . . .

"Q. You never saw Mrs. Inglis again? A. No. Q. You never saw Mrs. Johanson again? A. No. Q. Did you ever see Dr. Johanson again? A. Not to my knowledge. . . . Q. Did you ever inquire of Mrs. Johanson how her litigation was coming on? A. No, I did not. That would be absolutely useless. . . . Q. Why didn't you go back, if you were hired to go back there? A. Why didn't I go back?—Simply because he simply quit. Q. You say you were hired to go back, why didn't you go back? A. He was to pay all the expenses of my going back there. Q. You told this jury you were hired to go back, but you did not go back, and the only reason you didn't go back there because of expenses, is that the idea? A. It was because I knew that Dr. Johanson had gone back there and employed other counsel, and he did not intend to engage me, or have anything further with me. Q. You understood you were to go back immediately? A. That was our agreement."

Dr. Johanson left Seattle for Denver during the night of April 25, 1917, taking with him powers of attorney from Mrs. Johanson and Mrs. Inglis to enable him to represent them in making claims to the property in Denver with other members of the older set of children. He says he went there in response to a communication from certain members of the older set of children residing there. On April 29, 1917, the older set of children, Dr. Johanson representing Mrs. Johanson and Mrs. Inglis, employed counsel in Denver, who commenced proceedings in court there to prevent distribution on the day set and to establish the will of their stepmother and the mutual agreement attending the making of the mutual wills of their stepmother and their father, to the end that all nine children would

share equally in the property. The litigation so commenced was prosecuted in the Colorado courts for a period of approximately four years to a successful termination in favor of the older set of children, and resulted in Mrs. Johanson ultimately receiving from the estate property worth approximately $100,000; that litigation being finally terminated by a decision of the supreme court of Colorado rendered on December 6, 1920, *Brown v. Johanson,* reported in 69 Colo. 400, 194 Pac. 943. On August 3, 1920, after the rendering of the judgment of the Colorado trial court in favor of the older set of children, but before the affirmance of that judgment by the supreme court of that state, Wright commenced this action in the superior court for King county, seeking recovery for $25,000 upon his alleged contingent fee contract with Mrs. Johanson.

It is at once apparent that any cause of action upon which Wright could recover for his services would be barred at the expiration of three years from its accrual, because any such cause of action must manifestly rest upon an alleged contract of services "which is not in writing and does not arise out of any written instrument." Rem. Comp. Stat., § 159 [P. C. § 8166].

When did Wright's cause of action accrue, if any he ever had, for compensation for services rendered to Mrs. Johanson? His counsel insist that it accrued under his contingent fee contract when the Colorado litigation resulted in a judgment favorable to Mrs. Johanson, which occurred within three years prior to his commencement of this action on August 3, 1920. Counsel for Mrs. Johanson insist that whatever cause of action Wright may have for his services rendered to her, accrued more than three years prior to the commencement of this action; that is, accrued prior to August 3, 1917, because by his own testimony he has shown that his services were dispensed with and he

was, in legal effect, discharged as attorney for Mrs. Johanson prior to that date.

Was Wright, in legal effect, discharged as attorney for Mrs. Johanson prior to August 3, 1917? It seems to us his own testimony conclusively so shows. He was employed, if at all, about April 14, 1917. He never had but the two conferences with Mrs. Johanson or with anyone for her, the latter occurring some two or three days after the first. He learned that Dr. Johanson went to Denver on April 25, 1917, very soon after Dr. Johanson's departure, and soon thereafter in two brief conversations over the telephone with Mrs. Johanson, he says she assured him that Dr. Johanson would wire him from Denver. Dr. Johanson never wired him from Denver, nor did he ever have any further communication with Mrs. Johanson or Dr. Johanson relative to the case, nor did he ever do anything more looking towards the promotion of Mrs. Johanson's interests in that behalf. He was employed about April 14th, according to his own testimony, to go to Denver and commence work upon the case immediately, all of them recognizing the necessity of prompt action in view of the hearing upon the distribution of the estate being set for an early date. He was to go to Denver only upon being finally instructed so to do by Dr. Johanson. He did not go because he was not instructed so to do. This suspension of his activities as attorney in the case continued for a period of six weeks or, at most, two months, when, other counsel being employed in Denver to represent the older children, including Mrs. Johanson, it became fully apparent that Wright's services were no longer desired, and that those who had employed him had, in legal effect, discharged him, which he manifestly fully realized as occurring, in so far as they could legally discharge him, not later than two months after his alleged employment on April 14, 1917,

or at most not later than two months after Dr. Johanson went to Denver on April 25, 1917. So, according to Wright's own testimony, several weeks before August 3, 1917, Mrs. Johanson and Dr. Johanson had fully concluded to dispense with Wright's services, and by their action in the premises had then clearly made known to him that they did not regard him as being any longer employed by them.

Now what cause of action did Wright possess against Mrs. Johanson for services rendered to her? Was it upon his contingent fee contract, was it for damages for breach of that contract, or was it upon *quantum meruit* for such services as he actually performed prior to his discharge as her attorney? We think, in view of the nature of a service contract between attorney and client and the peculiar relation of trust and confidence thereby arising between them, it was the latter. The nature of a contingent fee contract between an attorney and client, the right of the client at any time to terminate the attorney's employment under such a contract, and the nature of the attorney's cause of action for compensation for services actually rendered thereunder, are ably and exhaustively discussed by the court of appeals of New York in *Martin v. Camp,* 219 N. Y. 170, 114 N. E. 46. Judge Seabury, speaking for the court, there said:

"The contract stipulated that the compensation to be paid should be contingent upon success and fixed the sum that was to be paid in event of success as a proportion of the amount recovered. The plaintiff's assignors rendered substantial services under their contract and were discharged by the appellant without cause. The first question which we are called upon to determine is whether an attorney employed for a single litigation, who is dismissed by his client without cause, may maintain an action for damages for the breach of that contract or whether he is limited to a recovery

based upon a *quantum meruit* . . . the nature of the contract existing between attorney and client has been the subject of frequent discussion. (*Matter of Dunn,* 205 N. Y. 398 and cases cited; *Andrewes v. Haas,* 214 N. Y. 255, 259.) These cases and many others that might appropriately be cited to the same effect establish that while so far as the attorney is concerned the contract is entire and the attorney cannot recover unless he completely performs, the client with or without cause may terminate the contract at any time. The substance of the rule declared in these cases was expressed by Judge Hiscock in *Matter of Dunn (supra).* In that case it was said: 'It is well established in the case of the client that he may at any time for any reason which seems satisfactory to him, however arbitrary, discharge his attorney.' (p. 402.)

"That the client may at any time for any reason or without any reason discharge his attorney is a firmly-established rule which springs from the personal and confidential nature of the relation which such a contract of employment calls into existence. (Matter of Dunn, 205 N. Y. 398.) If the client has the right to terminate the relationship of attorney and client at any time without cause, it follows as a corollary that the client cannot be compelled to pay damages for exercising a right which is an implied condition of the contract. If in such a case the client can be compelled to pay damages to his attorney for the breach of the contract, the contract under which a client employs an attorney would not differ from the ordinary contract of employment. In such a case the attorney may recover the reasonable value of the services which he has rendered but he cannot recover for damages for the breach of contract. The discharge of the attorney by his client does not constitute a breach of the contract, because it is a term of such contract, implied from the peculiar relationship which the contract calls into existence, that the client may terminate the contract at any time with or without cause."

Our own decision in *Ramey v. Graves,* 112 Wash. 88, 191 Pac. 801, is in full harmony with this view of the law. We there said:

"The contract in this case being for a contingent fee and the respondent being discharged or prevented from rendering the services which he had contracted to perform, the first question that arises is, What is the correct measure of damages in such a case? The rule is that, where the compensation of an attorney is to be paid to him contingently on the successful prosecution of a suit and he is discharged or prevented from performing the service, the measure of damages is not the contingent fee agreed upon, but reasonable compensation for the services actually rendered. 6 Corpus Juris 725; *Pratt v. Kerns,* 123 Ill. App. 86; *Joseph's Adm'r v. Lapp's Adm'r,* 25 Ky. Law 1875, 78 S. W. 1119; *Western Union Tel. Co. v. Semmes,* 73 Md. 9, 20 Atl. 127; *Harris v. Root,* 28 Mont. 159, 72 Pac. 429; *French v. Cunningham,* 149 Ind. 632, 49 N. E. 797."

We do not fail to note that the word "damages" is there used as designating the recovery a discharged attorney is entitled to, measurable by the reasonable value of his services actually rendered under a contingent fee contract. This, we now think, was an inexact use of the word "damages," and the word so used was intended to mean merely "recovery." That action was not one for damages as for an injury, but was one seeking compensation for services rendered, for which manifestly the court would have awarded recovery as upon *quantum meruit* had any value of such services been proven. We adopt the view of the New York court above noticed that recovery in such a case is not a recovery of damages in the strict sense of that term, nor is it a recovery upon the contingent fee contract, but a recovery for services upon *quantum meruit,* and this, we think, is the real meaning of our decision in *Ramey v. Graves, supra.* We conclude that Mrs. Johanson was within her legal rights in dispensing with the services of Wright, and that she did not thereby become liable to him in damages as for breach of contract, but only became liable upon *quantum meruit* for

services rendered to her by him prior to such discharge.

We assume for argument's sake that Wright rendered services to Mrs. Johanson for which he could recover compensation in this action, as upon *quantum meruit,* though he sues directly upon his contingent fee contract, if such recovery be not barred by our three-year statute of limitations. In view of the law as announced in the New York decision and our own decision above noticed, it. seems plain that Wright's cause of action for compensation for services rendered to Mrs. Johanson accrued upon his services being dispensed with and his discharge, which, we have seen, occurred prior to August 3, 1917, more than three years prior to his commencement of this action. Practically this same situation was involved in *Martin v. Camp, supra,* in reference to which Judge Seabury, speaking for the court, further said:

"The contract of an attorney with his client being an entire and continuous contract, the Statute of Limitations does not begin to run against a claim for services under such contract until the final service has been performed. (*Eliot v. Lawton,* 7 Allen, 274; *Powers v. Manning,* 154 Mass. 370, 376.) If, however, the services are brought to an end, the cause of action on behalf of the attorney is complete and the statute commences to run against the claim. As was said in *Adams v. Fort Plain Bank* (36 N. Y. 255, 260): 'the test, therefore, being whether the statute begins to run or not, is, could an action be commenced at once for the demand?' In *Bathgate v. Haskin* (59 N. Y. 533, 535) Judge Andrews said: 'No right of action accrues for each successive service in the progress of the cause, and the statute does not begin to run against his claim for compensation until his relation as attorney in the suit has terminated. The client may terminate it at his pleasure.' On behalf of the respondent it is urged that the plaintiff's claim is not barred by the statute because the contract under which the plaintiff's assignors

were employed makes the compensation of the attorneys contingent upon the result of an award being made to the client. The award to the client was not made until October 20th, 1902, and it is argued that the cause of action did not accrue until this time and, therefore, the claim of the plaintiff is not barred by the statute. If the plaintiff's assignors had not been discharged their cause of action would not have accrued until the contingency happened upon which their right to compensation was, by the contract, made to depend. (*Ga Nun v. Palmer,* 202 N. Y. 483.) The cause of action of the plaintiff's assignors however, accrued when they were discharged by their client and the contract of employment terminated.''

Wright's cause of action being for compensation for services rendered and terminated more than three years prior to his commencement of this action in the superior court, it must now be held that his right of recovery is barred by our three-year statute of limitations.

The judgment of the superior court is reversed, and the cause remanded to that court to render a final judgment of dismissal in favor of Mrs. Johanson, denying to Wright recovery in any sum.

TOLMAN, C. J., MAIN, BRIDGES, and MITCHELL, JJ., concur.