No. 99-572

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 201

300 Mont. 480

5 P.3d 1031

---

PATRICK N. BURKHART,

Plaintiff and Appellant,

v.

SEMITOOL, INC.,

Defendant and Respondent.

---

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

The Honorable Ted O. Lympus, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Dean D. Chisholm, Kaplan & Chisholm, PLLP, Columbia Falls, Montana

For Respondent:

Douglas J. Wold & Leslie Ann Budewitz, Wold Law Firm, P.C.,

Polson, Montana

---

Submitted on Briefs: April 20, 2000

Decided: July 20, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

1. ¶The Plaintiff, Patrick Burkhart, brought this action in the District Court for the Eleventh Judicial District in Flathead County, to recover damages from the Defendant, Semitool, Inc., based on his allegation that it violated the Wrongful Discharge from Employment Act (WDEA); fraudulently or maliciously opposed Burkhart's application for unemployment benefits; and fraudulently misrepresented Burkhart's employment duties at the time of hiring. The parties agreed to submit the WDEA claims to arbitration. The Defendant then filed a motion to dismiss all of Burkhart's claims. The District Court converted the Defendant's motion to dismiss to a motion for summary judgment, and awarded summary judgment to Semitool. Burkhart appeals the District Court's award of summary judgment. We reverse the judgment of the District Court.

2. ¶The following issues are presented on appeal:

3. ¶1. Did the District Court have jurisdiction to consider the merits of the WDEA claims after the parties agreed to submit the claims to arbitration?

4. ¶2. Did the District Court err when it held that, as a matter of law, employees who are hired to provide legal advice or services are precluded from bringing employment claims if proof of their claims requires disclosure of confidential matters?

## FACTUAL BACKGROUND

1. ¶The Plaintiff, Patrick Burkhart, is a licensed patent attorney. Burkhart is admitted to practice law in the state of Illinois. On November 26, 1996, Burkhart accepted an offer of employment as patent counsel for the Defendant, Semitool, Inc. The offer included the following provision:

Any controversy or claim arising out of termination of employment after your probationary period has expired shall be settled by arbitration as provided in Montana's Uniform Arbitration Act, 27-5-211 et seq., MCA. The laws of Montana shall apply.

1. ¶As Semitool's patent counsel Burkhart was required to track invention disclosures and joint development agreements, report to senior management and communicate with other departments, and work with outside counsel who performed patent searches and prepared patent applications. Several months after Burkhart was hired, his reporting responsibility was transferred from CEO, Ray Thompson, to Vice-

President and Director of Technology, Bob Berner.

2. ¶In his deposition, Burkhart testified that his new supervisor, Bob Berner, ordered him to prepare and file what Burkhart believed to be fraudulent patent applications. Burkhart further testified that, following his refusal to do so, Berner fired him on August 28, 1997. At the time of his discharge, Burkhart was provided with a letter from Berner which stated the following:

After eight months of employment, it is apparent that you are not providing the service Semitool hoped to receive. As a result, your employment is terminated today August 28, 1997.

As you know from conversations with the management team, the company has not been satisfied with your job performance. Your failure to adequately communicate to management your progress on specific projects despite repeated requests and counseling is an obstacle in Semitool's efforts to reach its business objectives.

1. ¶Following his discharge, Burkhart applied for unemployment benefits. Semitool filed an objection to his request on the grounds that Burkhart had been terminated for cause. Nevertheless, Burkhart was awarded unemployment benefits, which he received for approximately six weeks prior to joining his wife, also a patent attorney, in her patent practice.

2. ¶On December 23, 1997, Burkhart filed a complaint against his former employer, Semitool. Burkhart's complaint alleged four claims for relief. Count I alleged that he had been discharged without good cause in violation of the WDEA, specifically, § 39-2-904, MCA. Count II alleged that he had been discharged in retaliation for his refusal to violate public policy in violation of the WDEA, specifically, § 39-2-904, MCA. Count III alleged that Semitool's opposition to his application for unemployment benefits was made without probable cause to support such opposition, and was motivated by malice. Count IV alleged that the representations made to Burkhart by Semitool prior to his employment were deceptive, contained misrepresentations, and included false advertising concerning the kind or character of the employment, and that such representations were motivated by malice.

3. ¶On February 9, 1998, Semitool filed its answer and a demand for arbitration pursuant to § 39-2-914, MCA. Burkhart accepted Semitool's offer to arbitrate on

March 6, 1998. However, Burkhart's acceptance was limited to his WDEA claims in Counts I and II. On April 30, 1998, the parties stipulated that a portion of the District Court record would be sealed to avoid disclosure of confidential information. On July 7, 1998, the District Court ordered that a portion of the District Court's record be sealed and all hearings on Semitool's motion for summary judgment pertaining to trade secrets be closed to the public.

4. ¶On August 11, 1998, Semitool filed a motion to dismiss for failure to state a claim or alternatively a motion to compel arbitration of all four claims. A hearing to consider Semitool's motion to dismiss, which the District Court converted to a motion for summary judgment, and Semitool's motion to compel arbitration of all four claims was held on December 2, 1998. On September 10, 1999, the District Court issued its order and rationale in which it granted Semitool's motion for summary judgment, and dismissed all four of Burkhart's claims. Burkhart now appeals the District Court's award of summary judgment.

## STANDARD OF REVIEW

1. ¶We review a district court's conclusions of law regarding arbitration to determine whether they are correct. *See Ratchye v. Lucas*, 1998 MT 87, ¶ 14, 288 Mont. 345, ¶ 14, 957 P.2d 1128, ¶ 14. Our standard of review for an appeal from a summary judgment ruling is de novo. *See Montana Metal Bldgs, Inc. v. Shapiro* (1997), 283 Mont. 471, 474, 942 P.2d 694, 696.

## DISCUSSION

## ISSUE 1

1. ¶Did the District Court have jurisdiction to consider the merits of the WDEA claims after the parties agreed to submit the claims to arbitration?

2. ¶Burkhart asserts that the District Court erred when it decided Counts I and II by summary judgment, because the District Court no longer had jurisdiction to do so after the parties agreed to arbitrate those claims. Semitool contends that the District Court had jurisdiction to make the threshold determination of whether the arbitration agreement was valid and enforceable, or void. Semitool asserts that, because the District Court correctly determined that the parties did not have a valid and enforceable agreement to arbitrate, summary judgment was proper.

1. ¶Both parties rely on *Ratchye v. Lucas*, 1998 MT 87, 288 Mont. 345, 957 P.2d 1128, in support of their respective positions. In *Ratchye*, the Plaintiff sought to enforce a settlement agreement in the district court. The defendant filed a motion to compel arbitration pursuant to the provision in the settlement agreement which provided that "any controversy or claim rising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration . . . ." *Ratchye*, ¶ 15. However, the District Court ordered specific performance of the settlement agreement based on its finding that the intention of the parties to the settlement agreement was clear and, therefore, there was no need to submit the issue to arbitration because it would only cause additional delay and expense. *Ratchye*, ¶ 22. In concluding that the District Court had erred when it ordered specific performance of the agreement and refused to grant the parties' application to compel arbitration pursuant to the settlement agreement, we stated:

[A]n agreement to submit any controversy to arbitration is valid and enforceable except on the grounds that exist at law or in equity for the revocation of a contract. Section 27-5-114, MCA. A court may rescind a written contract under circumstances such as mistake, duress, menace, fraud, undue influence, failure of consideration, void consideration, or lack of consent of the parties. See §§ 28-2-1714(1) and -1711, MCA. Also, a court may set aside a contract that is unlawful or which prejudices the public interest. See § 28-2-1714 (2) and (3), MCA.

. . . .

Furthermore, under § 27-5-115(5), MCA, a motion to compel parties to arbitrate "may not be refused on the ground that the claim in issue lacks merit or good faith or because no fault or grounds for the claim sought to be arbitrated have been shown." *We determine that once the District Court realized that the parties had a dispute concerning the agreement, it could not ignore the arbitration provision in Paragraph 12 and proceed to decide the dispute. Instead, the court should have ordered the parties to arbitrate the dispute as they agreed.*

*Ratchye, ¶¶ 24-25 (emphasis added.) We further stated that "[a] district court may not decide the*

*merits of a case when a valid agreement requires the parties to a dispute to submit to arbitration." Ratchye, ¶ 26.*

1. ¶Semitool asserts that the District Court correctly set aside the arbitration agreement because proof of the allegations in the complaint would require disclosure of confidential attorney-client matters, and to do so would violate the public's interest in preserving the confidential nature of the attorney-client relationship.

2. ¶In its order and rationale granting Semitool's motion for summary judgment, the District Court stated:

First, the Court determines that it has jurisdiction to consider Defendant's motions under both the Uniform Arbitration Act, Secs. 27-5-114 and 27-5-115(1), M.C.A., and the *Ratchye* decision.

The District Court then concluded that:

Violation of that [attorney-client] privilege prejudices the public interest. Such prejudice is a proper ground upon which to find and the Court consequently does find that the arbitration agreement is not valid and not enforceable to the extent that it requires arbitration of issues requiring violation of the attorney-client privilege. The same finding is warranted regardless of whether the arbitration agreement arises out of the written employment agreement of the WDFEA.

1. ¶Section 27-5-114(3), MCA, the statute cited by *Ratchye* for the proposition that an agreement to arbitrate is valid and enforceable except upon grounds that exist at law or in equity for the revocation of a contract, is part of the Uniform Arbitration Act. Section 27-5-114, MCA, is entitled "validity of arbitration agreement-exceptions." The violation of public interest exception pertains to the validity of the arbitration agreement, not to the merits of the underlying dispute.

2. ¶Furthermore, while it is true that the offer of employment signed by Burkhart contained an agreement to arbitrate which provided that all disputes arising out of termination of his employment with Semitool would be subject to the Montana Uniform Arbitration Act, Semitool's demand for arbitration was pursuant to § 39-2-914(5), MCA, of the WDEA. As stated by Semitool in its brief in support of its motion to dismiss:

Semitool demanded arbitration under the Wrongful Discharge From Employment Act, § 39-2-914, MCA. Semitool's demand does not invoke the arbitration provision of the November 22, 1996 offer letter because Mr. Burkhart contested whether the letter provision is effective.

1. ¶Accordingly, § 39-2-914(5), MCA, which provides for arbitration in a WDEA action is the controlling statute in this case. Section 39-2-914, MCA, provides:

(1) A party may make a written offer to arbitrate a dispute that otherwise could be adjudicated under this part.

(2) An offer to arbitrate must be in writing and contain the following provisions:

. . . .

(b) The arbitration must be governed by the Uniform Arbitration Act, Title 27, chapter 5. If there is a conflict between the Uniform Arbitration Act and this part, this part applies.

. . . .

(5) If a valid offer to arbitrate is made and accepted, arbitration is the exclusive remedy for the wrongful discharge dispute and there is no right to bring or continue a lawsuit under this part.

1. ¶The plain language of § 39-2-914(5), MCA, clearly provides that once an offer to

arbitrate has been accepted, neither the district court nor the parties have a right to continue the lawsuit. Nor is there any exception based on the validity of the arbitration agreement because arbitration pursuant to § 39-2-914(5), MCA, does not require an arbitration agreement prior to the dispute. Section 39-2-914(5), MCA, provides for the right to request arbitration of any dispute which could be adjudicated pursuant to the WDEA, within 60 days after service of the complaint.

2. ¶While our decision in *Ratchye* discusses the application of §§ 27-5-114 and -115, MCA, of the Montana Uniform Arbitration Act, § 39-2-914, MCA, provides that the Montana Uniform Arbitration Act applies only to the extent that it is not inconsistent with the provisions in § 39-2-914, MCA. Accordingly, our analysis in *Ratchye* also only applies to the extent that it is consistent with § 39-2-914, MCA.

3. ¶Therefore, we conclude that the District Court erred when it decided the merits of Counts I and II. The District Court no longer had jurisdiction to do so once the parties agreed to arbitration pursuant to § 39-2-914(5), MCA. Accordingly, we reverse the judgment entered by the District Court on Counts I and II, and remand those claims for arbitration.

## ISSUE 2

1. ¶Did the District Court err when it held that, as a matter of law, employees who are hired to provide legal advice or services are precluded from bringing employment claims if proof of their claims requires disclosure of confidential matters?

2. ¶Burkhart asserts that the District Court erred when it held that attorneys employed as staff counsel are, as a matter of law, precluded from bringing employment claims if proof of the claims may require divulging privileged communications. Burkhart contends that the District Court's reliance on authority from several other jurisdictions was misplaced because the authorities were poorly reasoned and do not take into account the unique provisions of Montana's WDEA, Rules of Professional Conduct and Montana's Constitution.

3. ¶Specifically, Burkhart asserts that Montana's Rules of Professional Conduct recognize an attorney's right to maintain an action against a former client and Rule 1.6 specifically provides that a lawyer can reveal communications from a client when necessary to establish a claim in a controversy between the lawyer and the client. Further, Burkhart contends that the WDEA specifically grants a cause of action to employees for wrongful termination which cannot be denied by the District Court's preferred public policy. Burkhart points out that the WDEA applies to any "person who works for another for hire," and that there is no exclusion for attorneys.

4. ¶In response, Semitool asserts that the District Court correctly held that a lawyer employed as staff counsel may not pursue a claim for wrongful discharge or other employment related claim when doing so will require the disclosure of confidential attorney-client information. Semitool argues that even those jurisdictions which permit a lawyer to sue a client for a wrongful termination only permit it where the action can be proven without reliance on attorney-client communications and, accordingly, do not permit it where the action requires proof of such communications. Semitool further asserts that the Montana Rules of Professional Conduct do not contemplate the disclosure of confidential information in a suit for wrongful discharge. Finally, Semitool contends that because the Montana Constitution gives the Montana Supreme Court sole authority to regulate the conduct of lawyers, to the extent that the WDEA interferes with that authority, it is unconstitutional.

5. ¶The District Court concluded as follows:

It is clear that Montana employees, including Plaintiff, have a right to WDFEA protection. It is equally clear that Defendant has a right to protection of its trade secrets and its attorney-client relationship, which includes the right to maintain privileged communications and the right to terminate the relationship at any time, with or without cause. When those rights conflict, as they do here, the issue is: which right dominates? The attorney-client privilege must prevail . . . .

1. ¶The issue of whether staff counsel are, as a matter of law, precluded from bringing employment claims because proof of the claim may require divulging confidential attorney-client communications, is an issue of first impression in Montana. Several other jurisdictions have addressed the issue and two different views have emerged from those analyses. The first view denies "in-house" counsel the right to sue their employer for retaliatory discharge. *See Balla v. Gambro, Inc.* (Ill. 1991), 584 N.E.2d 104; *Willy v. Coastal Corp.* (S.D. Tex. 1986), 647 F. Supp. 116; *Herbster v. North American Co. for Life & Health Ins.* (Ill. App. Ct. 1986), 501 N.E.2d 343. The second view permits an "in-house" attorney to maintain an action for retaliatory discharge, as long as such an action may be proven within the confines of the attorney's respective ethical obligation to maintain client confidences. *See General Dynamics Corp. v. Superior Court* (Cal. 1994), 876 P.2d 487; *GTE Prods. Corp. v. Stewart* (Mass. 1995), 653 N.E.2d 161; *Parker v. M & T Chems., Inc.* (N.J. Super. Ct. 1989), 566 A.2d 215.

2. ¶The first line of cases follows the Illinois Supreme Court's analysis in *Balla v. Gambro*, *Inc.* (Ill. 1991), 584 N.E.2d 104. Balla was employed as in-house counsel and manager of regulatory affairs for Gambro, Inc., a manufacturer of kidney dialyzers. Through his employment, Balla learned that Gambro was planning to sell a shipment of dialyzers which did not comply with FDA regulations and could potentially cause death or serious bodily harm to patients. Balla spoke with the president of Gambro and informed him that he would do whatever was necessary to stop the sale of the defective dialyzers. Subsequently, Balla was fired by Gambro. Balla reported the shipment of defective dialyzers to the FDA, and the FDA seized the shipment and determined that the dialyzers were not in compliance with FDA standards.

3. ¶Balla then filed an action against Gambro for retaliatory discharge, a common law tort, which is a "limited and narrow" exception to Illinois' proposition that "an employer may discharge an employee-at-will for any reason or for no reason at all." *Balla,* 584 N.E.2d at 107. However, the Illinois Supreme Court denied Balla a cause of action for retaliatory discharge, basing their decision on both the public policy purpose behind the tort of retaliatory discharge and the effect such an action would have on the attorney-client relationship. The Illinois Supreme Court concluded as follows:

In this case, the public policy to be protected, that of protecting the lives and property of citizens, is adequately safeguarded without extending the tort of retaliatory discharge to in-house counsel. Appellee [Balla] was required under the Rules of Professional Conduct to report Gambro's intention to sell the "misbranded and/or adulterated" dialyzers.

. . . .

In-house counsel do not have a choice of whether to follow their ethical obligations as attorneys licensed to practice law, or follow the illegal and unethical demands of their clients. In-house counsel must abide by the Rules of Professional Conduct. Appellee had no choice but to report to the FDA Gambro's intention to sell or distribute these dialyzers, and consequently protect the aforementioned public policy.

. . . .

In addition, we believe that extending the tort of retaliatory discharge to in-house counsel would have an undesirable effect on the attorney-client relationship that exists between these employers and their in-house counsel . . . . Employers might be hesitant to turn to their in-house counsel for advice regarding potentially questionable corporate conduct knowing that their in-house counsel could use this information in a retaliatory discharge suit.

*Balla,* 584 N.E.2d at 108-09.

1. ¶The second line of cases follows the reasoning of the California Supreme Court, as set forth in *General Dynamics Corporation v. Superior Court* (Cal. 1994), 876 P.2d 487. In *General Dynamics Corporation,* General Dynamics' in-house counsel, Andrew Rose, filed an action for retaliatory discharge in which he alleged that his termination was related to several cover-ups by General Dynamics regarding employee drug use and security problems, in addition to a dislike of certain legal advice provided to General Dynamics by Rose.
2. ¶In concluding that Rose's status as in-house counsel did not preclude him from maintaining an action for retaliatory discharge, the California Supreme Court declined to follow the reasoning of the Illinois Supreme Court in *Balla*, stating:

[T]he emphasis by the *Balla, Herbster* and *Willy* courts on the "remedy" of the in-house attorney's duty of "withdrawal" strikes us as illusory. Courts do not require nonlawyer employees to quietly surrender their jobs rather than "go along" with an employer's unlawful demands. Indeed, the retaliatory discharge tort claim is designed to encourage and support precisely the opposite reaction. Why, then, did the courts in these three cases content themselves with the bland announcement that the only "choice" of an attorney confronted with an employer's demand that he violate his professional oath by committing, say, a criminal act, is to voluntarily withdraw from employment, a course fraught with the possibility of economic catastrophe and professional banishment?

. . . .

Whatever the reason, the withdrawal "remedy" fails to confront seriously the extraordinarily high cost that resignation entails. More importantly, it is virtually certain that, without the prospect of limited judicial access, in-house attorneys--especially those in mid-career who occupy senior positions--confronted with the dilemma of choosing between adhering to professional ethical norms and surrendering to the employer's unethical demands will almost always find silence the better part of valor. Declining to provide a limited remedy under defined circumstances will thus almost certainly foster a degradation of in-house counsel's professional stature.

*General Dynamics Corp., 876 P.2d at 502.*

1. ¶The California Supreme Court then cautioned that "where elements of a wrongful discharge in violation of fundamental public policy claim cannot, for reasons peculiar to the particular case, be fully established without breaching the attorney-client privilege, the suit must be dismissed in the interest of preserving the privilege." *General Dynamics Corp.,* 876 P.2d at 503-04.
2. ¶ In this case, the District Court applied the analysis from the first line of cases, including *Balla,* stating:

The same reasoning [from *Balla*] applies herein, where Plaintiff alleges violation of patent disclosure application laws and procedures. His obligations under the Rules of Professional Conduct protect the same public policy as a retaliatory discharge claim and are a "sufficient safeguard."

1. ¶However, we conclude that the reasoning and analysis from the second line of cases, including the California Supreme Court's decision in *General Dynamics Corp.*, is a more sound and realistic approach to the issue before us. Moreover, as we will discuss below, we must further conclude that the plain language of Montana's WDEA requires this Court to recognize an in-house counsel's right to

pursue and maintain an action for wrongful discharge pursuant to the WDEA.

2. ¶In 1987, Montana became the first state to pass a statute prohibiting employment discharge in retaliation for an employee's refusal to violate public policy. Section 39-2-901 et seq., MCA, sets forth Montana's Wrongful Discharge From Employment Act. Section 39-2-904, MCA, provides:

A discharge is wrongful only if:

(1) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;

The WDEA defines an "employee" as "a person who works for another for hire. The term does not include a person who is an independent contractor." Section 39-2-903(3), MCA.

1. ¶Nevertheless, Semitool argues that application of the WDEA to the employment relationship of staff attorneys and the client employer is not proper for two reasons. First, Semitool asserts that the "universal rule" is that clients may fire lawyers at any time, for any reason, with or without cause. In support of its assertion, Semitool cites *Campbell v. Bozeman Investors of Duluth*, 1998 MT 204, 290 Mont. 374, 964 P.2d 41, wherein we quoted the following from *Rosenberg v. Levin* (Fla. 1982), 409 So. 2d 1016:

The attorney-client relationship is one of special trust and confidence. The client must rely entirely on the good faith efforts of the attorney in representing his interests. This reliance requires that the client have complete confidence in the integrity and ability of the attorney and that absolute fairness and candor characterize all dealings between them. *These considerations dictate that clients be given greater freedom to change legal representatives than might be tolerated in other employment relationships.*

*Campbell, ¶ 26 (emphasis added.)*

1. ¶In *Campbell*, we determined that the discharge of an attorney by a client was not a breach of the contingency fee contract and did not give rise to contract damages. We further determined that regardless of whether an attorney was discharged with or without cause, that attorney is entitled to a *quantum meruit* recovery for the

reasonable value of his services rendered to the time of discharge, citing *Fracasse v. Brent* (Cal. 1972), 494 P.2d 9. *See Campbell*, ¶ 30.

2. ¶In *General Dynamics Corp.,* the California Supreme Court addressed the exact point argued by Semitool, regarding the "universal rule" that lawyers may fire clients at any time, in the context of their opinion in *Fracasse*. The California Supreme Court stated:

If there is a unifying theme in this conflict, it is the claim of General Dynamics that our opinion in *Fracasse v. Brent* (1972) 6 Cal. 3d 784, 100 Cal. Rptr. 385, 494 P.2d 9 (*Fracasse*) is dispositive of all issues tendered against it by Rose in his complaint. Because *Fracasse* cloaks the client in an unfettered, absolute right to discharge an attorney at any time and for any reason, General Dynamics argues, the complaint cannot state a claim . . . .

In *Fracasse* . . . an attorney entered into a contingent fee contract with a client to represent her as a plaintiff in a personal injury lawsuit. Not long afterward . . . the client decided to end the relationship. She discharged the attorney, and retained other counsel to pursue her claim. The former attorney then filed a declaratory relief action against her, alleging that he had been discharged without cause and in breach of the contingency fee agreement . . . .

Although the core proposition established by our opinion in *Fracasse* . . . that "a client should have both the right and the power at any time to discharge his attorney with or without cause"--our holding in that case does not support the sweeping scope urged for it by General Dynamics. It should be evident to anyone reading our opinion in *Fracasse* that we confronted there one of the most common of the traditional forms of the lawyer-client relationship: the potential claimant who seeks redress by hiring an independent professional to prosecute her claim for personal injuries.

. . . .

The sources of contract and tort claims in wrongful termination cases are analytically distinct from the circumstances confronting the contingent-fee plaintiff that propelled our

analysis in *Fracasse*. Given these disparate origins, it is unlikely that the client's undoubted power to discharge the attorney at will is one that can be invoked under all circumstances without consequence. Even in *Fracasse*, we recognized the requirement that the dissatisfied personal injury contingent fee client compensate discharged counsel . . . [for] the reasonable value of any services provided in the event of a recovery.

*General Dynamics, 876 P.2d at 492-93.*

1. ¶We agree with the reasoning of the California Supreme Court. Our holding in *Campbell* does not create an "absolute" right to discharge an attorney with complete impunity, no matter the form of the attorney-client relationship. This would create an unjust result in a situation such as that before the court in this case. Rather, our holding in *Campbell* reiterates that in the traditional attorney-client relationship where the attorney merely acts as an independent contractor for his or her client, it is important that a client be able to terminate the relationship, regardless of the reason, without being liable for breach of the fee agreement. However, the "universal rule" does not apply in an attorney-client relationship where the attorney is an "employee" of the client, because in that context the client, by making his or her attorney an employee, has avoided the traditional attorney-client relationship and granted the attorney protections that do not apply to independent contractors, but do apply to employees, including the WDEA.
2. ¶Semitool additionally contends that application of the WDEA to an attorney violates Article VII, Section 2(3) of the Montana Constitution, which reserves the power to regulate attorneys exclusively to the Montana Supreme Court. Article VII, Section 2(3) of the Montana Constitution provides:

It [the Montana Supreme Court] may make rules governing appellate procedure, practice and procedure for all other courts, *admission to the bar and the conduct of its members*.

(Emphasis added.) We have construed this provision to give this Court exclusive authority to promulgate such rules. *See Kradolfer v. Smith* (1990), 246 Mont. 210, 213, 805 P.2d 1266, 1268.

1. ¶In support of its position, Semitool relies on *Harlen v. City of Helena* (1984), 208

Mont. 45, 676 P.2d 191, in which we held that a city ordinance requiring a business license fee for all persons carrying on a profession or occupation within the city, was an unconstitutional intrusion on this Court's constitutional authority to regulate lawyers.

2. ¶While it is true that this Court has the sole authority to regulate the conduct of lawyers, we do not have the sole authority to regulate employer conduct. The WDEA pertains solely to employer conduct and does not implicate the conduct of lawyers in the practice of law. It is, therefore, not an unconstitutional encroachment upon our sole authority to regulate lawyer conduct for the WDEA to apply to lawyers as employees or employers. Accordingly, we conclude that the WDEA's application to lawyers does not violate Article VII, Section 2(3) of the Montana Constitution.

3. ¶Finally, because we have concluded that the WDEA applies to "in-house" counsel and that, therefore, in-house counsel may maintain an action for wrongful discharge against his or her employer, we must address the issue of whether Rule 1.6 of the Montana Rules of Professional Conduct permits in-house counsel to disclose confidential information when necessary to establish an employment related claim against his employer-client.

4. ¶In 1984, Montana adopted the American Bar Association's Model Rules of Professional Conduct. Rule 1.6 of the Montana Rules of Professional Conduct provides:

## Rule 1.6 - Confidentiality of Information

**(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).**

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm; or

(2) *to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client*, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

(Emphasis added.)

1. ¶Semitool contends that Rule 1.6 does not give "a blanket permission to reveal confidences whenever there is a controversy." It argues that if we so hold, the other restrictions in the rule would be meaningless.

2. ¶We agree that Rule 1.6 does not grant permission to reveal confidences whenever there is a controversy. The rule limits disclosure to those situations where necessary to "establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client." We disagree that to apply the exception as written would make other restrictions in the rule meaningless. To the contrary, the other two exceptions are not restricted to a controversy between a lawyer and a client. Rather, they allow a lawyer to reveal confidential information in specific instances where the controversy may be between the lawyer and a third party. Thus, the other two exceptions simply build on the exception for establishing "a claim or defense . . . in a controversy between the lawyer and the client."

3. ¶Additionally, Semitool argues that the Official Comments to Rule 1.6, prepared by the ABA Model Rules editors, only contemplate three categories of controversies between lawyer and client that permit a lawyer to reveal confidential matters without the consent of the client, none of which includes a dispute over the lawyer's termination. The Comments to Rule 1.6 discuss applications of the rule in claims involving an assertion of lawyer wrongdoing or complicity in client wrongdoing; claims involving the conduct or representation of a former client, such as a malpractice claim against the lawyer; and a fee dispute. However, the Comments do not limit the application of Rule 1.6 to those specific situations.

4. ¶It is interesting to note the specific limitations contained in the similar rule of the Model Code of Professional Responsibility, which was the ABA's "Model Code" prior to the ABA's adoption of the Model Rules of Professional Conduct in 1983. The counterpart to Rule 1.6 of the Model Rules is Disciplinary Rule 4-101(C) of the Model Code, which provides that a lawyer may reveal the following:

(1) Confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.

(2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.

(3) The intention of his client to commit a crime and the information necessary to prevent the crime.

(4) *Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct.*

(Emphasis added.)

1. ¶In comparing the language of Rule 1.6 and DR 4-101(C), it is clear that the language set forth in the Model Rules is extremely broad. While the Comments to Rule 1.6 do not specifically state that a lawyer may reveal client confidences in order to support an employment-related claim, such a statement is not necessary, as the Comments merely state examples of situations in which Rule 1.6 may be applied. Moreover, the portion of the Comments entitled "Model Code Comparison," states:

With regard to paragraph (b)(2), DR 4-101(c)(4) provided that a lawyer may reveal "[c]onfidences or secrets necessary to establish or collect his fee or to defend himself or his employers or associates against an accusation of wrongful conduct." *Paragraph (b)(2) enlarges the exception to include disclosure of information relating to claims by the lawyer other than for the lawyer's fee - for example, recovery of property from the client.*

(Emphasis added.)

1. ¶If the ABA drafters of the Model Rules had intended to limit the application of the exceptions provided in Rule 1.6 for use only in defending claims against the lawyer and in fee disputes, as Semitool argues, the drafters could have simply retained the language from DR 4-101(C) of the Model Code, which did expressly limit the exceptions to those specific situations. However, the drafters did not retain that language. Instead, they chose to adopt the broad language which states "to assert a claim or defense" in any "controversy between the lawyer and the client."

2. ¶Accordingly, we conclude that the plain language of Montana's Rules of Professional Conduct, Rule 1.6, contemplates that a lawyer may reveal confidential attorney-client information, to the extent the lawyer reasonably believes necessary, to establish an employment-related claim against an employer who is also a client. We agree that "[a] lawyer . . . does not forfeit his rights simply because to prove them he must utilize confidential information. Nor does the client gain the right to cheat the lawyer by imparting confidences to him." *Doe v. A Corp.* (5th Cir. 1983), 709 F.2d 1043, 1050.

3. ¶In balancing the need to protect confidential information and the attorney-client relationship, with an in-house counsel's right to maintain a claim against his employer-client, we note that a court and the respective parties may use several equitable measures at their disposal "designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege," such as "the use of sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings." *General Dynamics*, 876 P.2d at 504. Moreover, such measures are contemplated by Rule 1.6 of the Montana Rules of Professional Conduct, as expressed in the Comments:

[T]he lawyer must make every effort practicable to avoid unnecessary disclosure of information relating to a representation, to limit disclosure to those having the need to know it, and to obtain protective orders or make other arrangements minimizing the risk of disclosure.

1. ¶Accordingly, we conclude that in-house counsel may maintain an action for

employment related claims against an employer-client, and that such claims are within the contemplation of Rule 1.6 of the Montana Rules of Professional Conduct, which permits an attorney to reveal confidential attorney-client information to establish a claim in a controversy between the lawyer and the client. Consequently, we further conclude that the District Court erred when it granted summary judgment based on its conclusion that, as a matter of law, in-house legal counsel are precluded from bringing employment claims if proof of their claims requires disclosing confidential matters. The District Court's order granting summary judgment is reversed and those claims not submitted to arbitration are remanded to the District Court for further proceedings consistent with this opinion.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ KARLA M. GRAY