

This opinion was
filed for record
at 8am on July 18, 2019

for Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

JARED KARSTETTER and JULIE
KARSTETTER, his spouse, who together
form a marital community,

        Petitioners,

      v.

KING COUNTY CORRECTIONS GUILD,
a nonprofit corporation doing business as
a labor union; RANDY WEAVER, SONYA
WEAVER, LEONARD ORTH, KATHERINE
ORTH, GARRIN CLARK, GABRIEL VIGIL,

        Respondents,

    and

WILLIAM B. AITCHISON, ANIL S. KARIA,
TREVOR CALDWELL, individually and as
representatives; and PUBLIC SAFETY LAW
GROUP, a legal services public corporation,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 95531-0

Filed    JUL 1 8 2019

WIGGINS, J.—Far from the lawyers of old, who toiled "alone in a solitary office . . . unhallowed by humanizing domestic associations,"[1] today's attorneys often work together with lawyers and nonlawyers alike, for clients ranging from nonprofits

---

[1] Herman Melville, *Bartleby, the Scrivener, in* LEGAL FICTIONS: SHORT STORIES ABOUT LAWYERS AND THE LAW 224, 248 (Jay Wishingrad ed., 1992).

and government agencies to massive, multijurisdictional corporations. *See* Hugh D. Spitzer, *Model Rule 5.7 and Lawyers in Government Jobs—How Can They Ever Be "Non-Lawyers"?*, 30 GEO. J. LEGAL ETHICS 45, 47 (2017) ("An increasing number of law graduates with licenses to practice are not engaged in traditional legal jobs."); Orly Lobel, *Lawyering Loyalties: Speech Rights and Duties within Twenty-First-Century New Governance*, 77 FORDHAM L. REV. 1245, 1262 (2009) (in-house attorneys have "administrative, managerial, and compliance responsibilities that are outside the direct scope of their legal roles"); Grace M. Giesel, *The Ethics or Employment Dilemma of In-House Counsel*, 5 GEO. J. LEGAL ETHICS 535, 544 (1992) (explaining that in-house counsel are considered "an essential component of the management team" by corporations and that these "attorneys affect the full range of corporate decisions"). The evolution in legal practice has uniquely affected the in-house attorney employee and generated unique legal and ethical questions unlike anything contemplated by our Rules of Professional Conduct (RPCs).

The case before us today presents just such a question: we must decide whether modern in-house employee attorneys should be treated differently from traditional private practice lawyers under our RPCs. We conclude that they should.

Solely in the narrow context of in-house employee attorneys, contract and wrongful discharge suits are available, provided these suits can be brought without violence to the integrity of the attorney-client relationship. Accordingly, we hold that Jared Karstetter alleged legally cognizable claims and pleaded sufficient facts to overcome a CR 12(b)(6) motion of dismissal. We reverse the Court of Appeals' ruling

2

dismissing Karstetter's claims and remand the case to the trial court for further proceedings consistent with this opinion.

Facts and Procedural History

Karstetter worked for labor organizations representing King County corrections officers for over 20 years. In 1987, Karstetter began working directly for the King County Corrections Officers Guild (Guild). Throughout his employment with the Guild, Karstetter operated under successive 5-year contracts that provided for just cause termination. This termination clause states,

> Consistent with the rights and expectations of the members that the GUILD represents ATTORNEY may be terminated for just cause. The definition of Just Cause shall be the same definition that is currently contained in the Collective Bargaining Agreement for GUILD members. In the event that the GUILD wishes to exercise this provision, due notice shall be provided to ATTORNEY and an opportunity to correct any behavior that GUILD deems inappropriate. ATTORNEY shall be afforded fundamental due process and an opportunity to answer to any and all charges. Termination of this Agreement shall be reserved as a final option.

CP at 13 (employment contract).[2]

Eventually, Karstetter formed his own law firm and worked primarily for the Guild. He offered services to at least one other client. His employment contracts remained substantially the same. Karstetter's wife also worked for the Guild as Karstetter's office assistant.

---

[2] The most recent contract between Karstetter and the Guild ran from January 1, 2012 through December 31, 2016. Karstetter attached an unsigned copy of the contract to his complaint. Based on Karstetter's allegation that his "contracts have been rolled over continuously since 1987," CP at 4, and despite the lack of signature, it appears the 2012-2016 contract was in force when Karstetter was terminated in May 2016.

In 2016, the King County ombudsman's office contacted Karstetter regarding a whistle-blower complaint concerning parking reimbursements to Guild members. The Guild's vice-president directed Karstetter to cooperate with the investigation. The Guild sought advice from an outside law firm, which advised the Guild to immediately terminate Karstetter. In April 2016, the Guild took this advice and, without providing the remedial options listed in his contract, fired Karstetter.

In response, Karstetter and his wife filed suit against the Guild, alleging, among other things, breach of contract and wrongful discharge in violation of public policy. The Guild moved to dismiss the suit for failure to state a claim. The trial court partially granted the motion but allowed Karstetter's claims for breach of contract and wrongful termination to proceed. On interlocutory review, the Court of Appeals reversed and remanded the case, directing the trial court to dismiss Karstetter's remaining breach of contract and wrongful termination claims. *Karstetter v. King County Corr. Guild*, 1 Wn. App. 2d 822, 407 P.3d 384 (2017). Karstetter sought review here, which we granted.

Analysis

The Guild argues that Karstetter's breach of contract and wrongful discharge claims are precluded by our ethical rules and should have been dismissed. Dismissal under CR 12(b)(6) is warranted only if we conclude that the plaintiff cannot prove any set of facts justifying recovery. *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007) (quoting *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 330, 962 P.2d 104 (1998)). All facts alleged in the complaint are taken as true, and we may consider hypothetical facts supporting the plaintiff's claim. *Id.* Whether Karstetter has alleged legally cognizable claims is a question of law that we review de novo. *Hoffer v.*

4

*State,* 110 Wn.2d 415, 420, 755 P.2d 781 (1988), *adhered to on recons.*, 113 Wn.2d 148, 776 P.2d 963 (1989).

    1.  RPC 1.16 does not necessarily prohibit in-house attorney employment claims

    RPC 1.16(a)(3) states that "a lawyer shall not represent a client . . . if . . . the lawyer is discharged." This rule robustly protects a client's right to terminate an attorney at any time, for any reason. RPC 1.16 cmt. 4; *Belli v. Shaw*, 98 Wn.2d 569, 577, 657 P.2d 315 (1983). Clients must trust their lawyers. When a client loses confidence in his or her attorney, the trust relationship is fractured, and a client must be allowed to discharge that attorney in order to engage another, better-suited advocate. In this traditional attorney-client relationship, RPC 1.16 would almost certainly prohibit a lawyer from bringing employment claims against a client. But such an interpretation of RPC 1.16 is neither required nor reasonable in the nontraditional circumstances of in-house attorney employees.

The Guild asserts that to protect individual clients and the public generally, RPC 1.16 applies to all attorneys without exception. But in and of itself, RPC 1.16 does not stand for this proposition. The rule simply states that clients may discharge their attorneys. RPC 1.16(a)(3). The rule specifies no reasons or requirements a client must meet to discharge an attorney—termination is allowed "at any time, with or without cause." RPC 1.16 cmt. 4. Importantly, however, RPC 1.16 does not recognize, let alone discuss, the nontraditional circumstances surrounding in-house attorneys and whether the rule does or should apply in that context. We have not "set out any all-encompassing rule for how violation of any RPC in connection with a contract might affect that contract's enforceability." *LK Operating, LLC v. Collection Grp., LLC*, 181

5

Wn.2d 48, 89, 331 P.3d 1147 (2014). Nor have we interpreted our ethical rules as providing absolute insulation from attorney-client litigation. *See Kimball v. Pub. Util. Dist. No. 1 of Douglas County*, 64 Wn.2d 252, 258, 391 P.2d 205 (1964) (discharged counsel may seek recovery for unjust enrichment).[3] Indeed, our professional rules themselves "do not apply uniformly to all lawyers." *Chism v. Tri-State Constr., Inc.*, 193 Wn. App. 818, 839, 374 P.3d 193 (2016) (citing RPC 1.11 (concerning only government lawyers)). RPC 1.16 does not expressly prohibit Karstetter's claims.

2. In-house attorneys face unique employment expectations and should not always be treated the same as private practice lawyers under the RPCs

The unique employment status of and demands on in-house attorneys counsel against a rigid interpretation of RPC 1.16. Today's legal employees operate differently from private sector attorneys. *See Gen. Dynamics Corp. v. Superior Court*, 7 Cal. 4th 1164, 1171-73, 876 P.2d 487, 32 Cal. Rptr. 2d 1 (1994). Economic success for in-house attorneys, unlike a law firm partner, "is tied directly to a single employer, at whose sufferance they serve." *Id.* at 1172; *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 860-61 (Tenn. 2002). The professional relationship between corporate counsel and a client employer is similarly distinct. The duties of today's corporate attorneys have grown increasingly complex, often including advisory and compliance roles as well as

---

[3] *Kimball* does not control the outcome of this case. In *Kimball*, a law firm contracted with a public utilities district for payment of the firm's fees. 64 Wn.2d at 255-56. Unlike Karstetter, *Kimball* concerned a private law firm, with attorneys who were not considered employees of the utilities district. *See id.* Our decision to allow the public entity to terminate the law firm at any time, with or without cause, *id.* at 257, does not conflict with today's opinion because the *Kimball* lawyers were engaged in the traditional attorney-client relationship to which RPC 1.16 applies. Karstetter's nontraditional relationship with his client employer is different and must be analyzed differently. *Kimball* is therefore distinguishable.

the more general aim of ensuring a successful business. *See Gen. Dynamics*, 7 Cal. 4th at 1172; Lobel, *supra*, at 1262.

The expectations for in-house attorneys are distinct from outside lawyers. The expansion of an employee attorney's duties coupled with the professional and financial dependence on a single client employer "can easily subject [that] attorney to unusual pressures to conform to organizational goals, pressures that are qualitatively different from those imposed on the outside lawyer." *Gen. Dynamics*, 7 Cal. 4th at 1172. While an outside lawyer enjoys distance and economic independence from the financial success of his or her client, an in-house attorney is dependent on the "good will and confidence of a single employer to provide livelihood and career success." *Id.* at 1182. And unlike outside counsel, for in-house attorneys with only one client—an employer— the "withdrawal 'remedy' fails to confront seriously the extraordinarily high cost that resignation entails." *Id.* at 1188; *see also* Peter D. Banick, Case Note, *The "In-House" Whistleblower: Walking the Line between "Good Cop, Bad Cop,"* 37 WM. MITCHELL L. REV. 1868, 1884 (2011) (noting that in-house attorneys often "cannot simply withdraw from a case or refuse to represent a particular client and forego some attorney's fees"); John Jacob Kabus, Jr., *Establishing Corporate Counsel's Right To Sue for Retaliatory Discharge*, 29 VAL. U. L. REV. 1343, 1378 (1995). Thus, the relationship between corporate counsel and the employer client "cannot be characterized solely as an attorney-client relationship"; it must be "viewed as an employer-employee relationship as well." Banick, *supra*, at 1908; *Gen. Dynamics*, 7 Cal. 4th at 1171-72.

A rigid application of RPC 1.16 to all lawyers, including in-house employee attorneys, not only ignores these abstract and practical distinctions but also overlooks

7

that the RPCs were written when few lawyers worked outside the traditional private law firm practice model. *See* John M. Burman, *Ethical Considerations When Representing Organizations*, 3 WYO. L. REV. 581, 582 (2003) (the Model Rules "grew out of the traditional lawyer-client relationship" (citing C.W. WOLFRAM, MODERN LEGAL ETHICS § 2.6 (1986))); *Gen. Dynamics*, 7 Cal. 4th at 1171-72 ("The growth in the number and role of in-house counsel has brought with it a widening recognition of the descriptive inadequacy of the nineteenth century model of the lawyer's place and role in society— one based predominantly on the small- to middle-sized firm."). Today, increasing numbers of attorneys work not in law firms but for governments, agencies, and nonprofits; in human resources, as lobbyists and corporate counsel. *See, e.g.*, Spitzer, *supra*, at 47 & nn.1-4 (noting the rise in law graduates working in nontraditional jobs such as government and business); *Alternative Careers*, COLO. L. (listing nonlegal public and private sector careers for law graduates in business and finance, human resources, nonprofit administration, technology, etc.), https://www.colorado.edu/law/careers/career-paths/alternative-careers [https://perma.cc/JE8R-8458]; Alexandra Levit, *Rethinking the Law*, WALL ST. J. (Jan. 31, 2010) (discussing strategies for attorneys seeking nonlegal employment), https://www.wsj.com/articles/SB126489547645038023 [https://perma.cc/6Z8T-TAEL].

Despite numerous amendments over the years, our rules have not evolved with the profession. They are still fundamentally influenced by "traditional" notions of lawyer-client relationships. *See* RPC Scope cmt. 23 ("The structure of these Rules generally parallels the structure of the American Bar Association's Model Rules of Professional Conduct."); *Gen. Dynamics*, 7 Cal. 4th at 1171-72. These traditional

undercurrents pose little problem when applying the RPCs to traditional lawyer-client relationships. We are mindful, however, of the limitations of this traditional influence when determining whether and how our ethical rules should apply to attorneys working in nontraditional positions for nontraditional employer clients. *See Gen. Dynamics*, 7 Cal. 4th at 1185 (noting criticism of cases rejecting in-house attorney wrongful discharge claims based on rules of professional conduct as reflecting "an unspoken adherence to an anachronistic model of the attorney's place and role in contemporary society" as well as "an inverted view of the consequences of the in-house attorney's essential professional role").

Given the many changes in legal practice since the RPCs were adopted, we decline to elevate RPC 1.16 against all competing interests. Concluding otherwise easily leads to unjust results. For instance, in-house attorneys would lose their jobs without the recourse afforded to their nonlawyer colleagues. *Gen. Dynamics*, 7 Cal. 4th at 1188 ("Courts do not require nonlawyer employees to quietly surrender their jobs rather than 'go along' with an employer's unlawful demands."); Banick, *supra*, at 1884. An in-house attorney could be hired by a corporation with an employment contract and could agree to a scope of work, salary, and termination for cause. The in-house attorney begins work, performing both legal and nonlegal duties as needed by the employer. The in-house attorney is then summarily fired for reasons not specified in the contract, perhaps related to legal work, perhaps to nonlegal work.

Immunizing an employer in this situation from all consequence ignores the realities of modern legal work and risks creating unconscionable results. We will not instruct in-house attorneys that our ethical rules allow employers to take away their

9

livelihood and then also leave them without any legal recourse under the facts before us today.

We have repeatedly held that violations of the RPCs in the formation of a contract may render that contract unenforceable as violative of public policy. *LK Operating*, 181 Wn.2d at 85. Because RPC 1.16 is not a uniform and unequivocal ban on attorney employment claims, Karstetter's suit does not violate this rule.[4]

We therefore hold that in the narrow context of in-house attorneys, contract and wrongful discharge suits are available, provided these suits can be brought "without violence to the integrity of the attorney-client relationship." *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 502 (Minn. 1991). In so doing, we join other states whose rules better fit the modern legal world. *E.g.*, *Gen. Dynamics*, 7 Cal. 4th at 1178-79; *Burkhart v. Semitool, Inc.*, 2000 MT 201, 300 Mont. 480, 5 P.3d 1031 (holding the right to terminate attorney without consequences does not apply to attorney-client relationships where an attorney is a client's employee); *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 653 N.E.2d 161 (1995) (concluding that an in-house attorney may bring an action for retaliatory discharge against an employer); *Parker v. M&T Chems., Inc.*, 236 N.J. Super. 451, 566 A.2d 215 (1989) (same); *cf. Balla v. Gambro, Inc.*, 145 Ill. 2d 492, 584 N.E.2d 104, 164 Ill. Dec. 892 (1991).[5]

---

[4] "The trial courts have at their disposal several measures to minimize or eliminate the potential untoward effects on both the attorney-client privilege and the interests of the client-employer resulting from the litigation of such wrongful termination claims by in-house counsel." *Gen. Dynamics*, 7 Cal. 4th at 1170.

[5] While the rule making process would be an advantageous and prudent means of recognizing an in-house attorney's ability to bring employment claims against client employers, *see* dissent at 4, we see no reason to wait for rule making when the case before us presents an opportunity to resolve this very issue. Indeed, we have not shied away from our duty to decide substantial legal

10

Considering our reexamination and application of RPC 1.16 to in-house attorney employees, we hold that Karstetter's claims under CR 12(b)(6) should not have been dismissed. Karstetter sufficiently alleged that he was "'an employee'" to overcome a CR 12(b)(6) dismissal, CP at 5, 14-16 (2006 "Employee Agreement" between Karstetter and the Guild), and his employment contract acknowledged the unique financial benefits and drawbacks of his employment situation: "It is understood that [Karstetter's salary] is substantially below market rates and is in consideration for the permanent employment relationship enjoyed by ATTORNEY as well as the unfettered access that the GUILD has to ATTORNEY which is essentially 24-hours a day, 7-days a week." CP at 12. Karstetter refrained from taking on clients that would conflict with his "full-time services to the Guild" and "severely limited his acceptance of private clients." CP at 6. Karstetter's just cause termination clause was "the same definition" as contained in the collective bargaining agreement for nonattorney Guild members. CP at 13. Like other in-house attorneys, Karstetter's economic and professional success depended exclusively on the Guild's goodwill and confidence. *See Gen. Dynamics*, 7 Cal. 4th at 1182. And, unlike private practice attorneys who enjoy some professional and economic distance from their clients, Karstetter's professional existence was intricately linked to the Guild.

For the reasons discussed above, we hold that in-house attorneys may pursue wrongful discharge and breach of contract claims against their client employers. We

issues in lieu of rule making in the past, even when proposed rules are pending before this court. *E.g.*, *City of Seattle v. Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017) (analyzing a defendant's alleged waiver to challenge the State's peremptory strike of the only black jury member despite the pending proposed GR 37, which would alter the method of evaluating these claims).

further hold that Karstetter has pleaded facts sufficient to bring these claims against the Guild as an in-house attorney employee. *See FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 180 Wn.2d 954, 962-63, 331 P.3d 29 (2014) (dismissal under CR 12(b)(6) is warranted only if the plaintiff cannot prove "'any set of facts which would justify recovery'" (internal quotation marks omitted) (quoting *Kinney*, 159 Wn.2d at 842)); *Kinney*, 159 Wn.2d at 842 (all facts alleged in a complaint are taken as true and we may consider hypothetical facts supporting the plaintiff's claim). Provided Karstetter's suit does not violate the integrity of the attorney-client relationship, it may proceed.[6]

3. Karstetter sufficiently pleaded whistle-blower protection

The Guild also contends that even if Karstetter could bring a wrongful discharge claim, he fails to plead that he was a whistle-blower. *Dicomes v. State* established four categories of protected behavior for wrongful discharge claims: (1) refusing to commit an illegal act, (2) performing a public duty or obligation, (3) exercising a legal right or privilege, or (4) whistle-blowing. 113 Wn.2d 612, 618, 782 P.2d 1002 (1989). The Guild argues that because Karstetter did not "desire[ ] to further the public good" when he

---

[6] We do not mean or imply that in-house attorneys escape disciplinary action or other consequences when they are required to take action under ethical rules not at issue in this case. For example, if Karstetter is found to have violated the integrity of the attorney-client relationship, not only would his wrongful discharge and breach of contract claims be unavailable under the rule established today, but he may also face attorney disciplinary action. *See* RPC 1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent."); *In re Shafer*, 149 Wn.2d 148, 66 P.3d 1036 (2003) (noting that a whistle-blower statute did not protect an attorney from disciplinary action for unnecessarily revealing client confidences to newspapers and the press). Further, our decision today is a narrow one, limited to in-house attorneys who are employed and operate as private employees for private employers. We do not opine on matters not before us: employment claims brought by traditional private practice attorneys and, more specifically, whether Karstetter's employment as an in-house attorney employee would survive summary judgment. Additional factual issues may arise should Karstetter decide to proceed with his complaint. Such potential issues are properly resolved at trial.

12

provided the requested information (after obtaining permission to do so from his employer), he is not entitled to whistle-blower protection. We disagree.

The Guild's argument undercuts the fundamental purpose of our whistle-blower statutes. Washington's whistle-blower provisions are intended to encourage those with knowledge of institutional wrongs to come forward in order to safeguard the public. *See, e.g.*, RCW 42.40.010, .020(2). Such protection is based on, among other things, the commonsense notion that employers should abide by the law and the intrinsic importance of fairness and justice in protecting individuals trying to "do the right thing." Banick, *supra*, at 1874-77; *see Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 671, 807 P.2d 830 (1991) (stating that *Diocomes'* whistle-blowing protection focuses on the employer's wrongdoing, not the employee's actions). Protecting only those who directly reveal information while sacrificing others who assist them would unjustly narrow the scope of whistle-blower statutes and caution future whistle-blowers to think twice before helping other whistle-blowers.

Here, Karstetter pleaded that he assisted the investigation of a whistle-blower complaint and alleged that he was fired for doing so. Karstetter's complaint satisfied the notice pleading rule by containing a short, plain statement of the claims and demand for judgment sufficient to survive a CR 12(b)(6) challenge on this ground. CR 8.[7] Even

---

[7] Because we conclude that Karstetter alleged facts supporting whistle-blower protection under *Diocomes*, we do not opine on Karstetter's contention that his actions also qualify as performance of a public duty or obligation. 113 Wn.2d at 618. We do, however, take this opportunity to clarify the appropriate application of the Perritt test. *See Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P2d 377 (1996) (establishing the four elements a plaintiff must prove under the Perritt test). The test was named after Professor Henry Perritt Jr., who first proposed the test in his 1991 academic treatise. *See* HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.7 (1991). Courts look to the Perritt test for guidance only when the facts of a claimed wrongful

assuming a positive statement of subjective intent to further the public good is required, we construe pleadings to do substantial justice, and parties may clarify initial pleadings in the course of summary judgment proceedings. *See State v. Adams*, 107 Wn.2d 611, 620, 732 P.2d 149 (1987).

4. Karstetter's request for attorney fees is premature

Karstetter sought attorney fees and costs at the Court of Appeals and renews his request before this court. RCW 49.48.030; RAP 18.1. RCW 49.48.030 awards reasonable attorney fees to a person "successful in recovering judgment for wages or salary owed to him or her." But, as the Guild correctly points out, Karstetter has not recovered any judgment for wages or salary owed to him. Karstetter's request for attorney fees is premature. *Mount Adams Sch. Dist. v. Cook*, 150 Wn.2d 716, 726-27, 81 P.3d 111 (2003); *accord Brundridge v. Fluor Fed. Svcs., Inc.*, 109 Wn. App. 347, 361, 35 P.3d 389 (2001) (holding pipe fitters' request for attorney fees arising from their wrongful termination claim was premature where pipe fitters had not yet obtained judgment for lost wages). We therefore deny his request for attorney fees.

---

discharge suit "do not fit neatly into" one of the *Diocomes* categories. *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 287, 358 P.2d 1139 (2015). When, as here, a plaintiff meets his or her burden to allege facts that "fall directly within the realm of wrongful discharge," the four-part Perritt framework is "unnecessary." *Id.*; *accord Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 722-24, 425 P.3d 837 (2018). Therefore, the Court of Appeals' reliance on the Perritt test to dismiss Karstetter's claim was error. *See Karstetter*, 1 Wn. App. 2d at 831-33.

## Conclusion

Our rules of professional conduct do not foreclose an in-house attorney employee from bringing breach of contract and wrongful discharge claims against an employer-client. We reverse the Court of Appeals and hold that in the narrow context of in-house attorneys, contract and wrongful discharge suits are available, provided these suits can be brought without violence to the integrity of the attorney-client relationship. We remand Karstetter's suit to the trial court for further proceedings consistent with this opinion.

*Karstetter et ux. v. King County Corr. Guild et al.*, No. 95531-0

15

_Wiggins, J._

WE CONCUR.

_Fairhurst, C.J._

_Stephens, J._

_González, J._

_Madsen, J._

_Yu, J._

*Karstetter et ux. v. King County Corr. Guild et al.*

No. 95531-0

OWENS, J. (dissenting) — "A client has a right to discharge a lawyer at any time, with or without cause." RPC 1.16 cmt. 4. This long-standing ethical rule serves the important public policy of promoting client trust, attorney loyalty, and public confidence in attorney-client relationships by mitigating the power differential between client and attorney in favor of the client. This mandate applied without exception to every attorney licensed to practice law in Washington—until now. In opening the door for terminated attorneys to sue their former clients, the majority upends a hallowed policy and hallmark facet of attorney employment. Because RPC 1.16 clearly memorializes a client's unfettered right to terminate an attorney without reprisal, I would hold the remedy of contract damages and the tort of wrongful discharge unavailable as matters of law. If the majority believes an exception to RPC 1.16 is merited for in-house counsel attorneys, the proper method for effectuating such a change would be through rulemaking.

Washington law has long held that a client may terminate an attorney at any

time and for any reason, including wantonly or out of caprice. *Wright v. Johanson*,

132 Wash. 682, 692, 233 P. 16 (1925); *Kimball v. Pub. Util. Dist. No. 1 of Douglas*

*County*, 64 Wn.2d 252, 257, 391 P.2d 205 (1964). "[I]t follows as a corollary that the

client cannot be compelled to pay damages for exercising a right which is an implied

condition of the contract." *Wright*, 132 Wash. at 692. Though the rule is a "harsh and

stringent one against the attorney," it is "necessary for the protection of the client in

particular and the public in general." *Kimball*, 64 Wn.2d at 257. This court codified

the rule when it promulgated RPC 1.16 as part of the RPCs in 1985.

Whatever the nature of the relationship between Jared Karstetter and the King

County Corrections Guild (Guild), Karstetter remained nonetheless an attorney

subject to the distinct ethical rubric binding on our profession. Insofar as Karstetter's

contract with the Guild contravened RPC 1.16, I would hold it unenforceable as

violative of public policy. *LK Operating, LLC v. Collection Grp., LLC*, 181 Wn.2d

48, 85-89, 331 P.3d 1147 (2014). The remedy of contract damages is plainly

anathema to the mandate memorialized in RPC 1.16 safeguarding a client's right to

discharge an attorney. Accordingly, I would hold that the Karstetters failed as a

matter of law to state a breach of contract claim for which relief can be granted.

Likewise, the tort of wrongful discharge is inappropriate in the attorney context

because attorneys are not governed by the general at-will doctrine, but by a specific

codified rule that expressly protects a client's right to release an attorney for any

reason. *See Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984). Even the California Supreme Court observed that "a majority of courts have refused to permit the maintenance of such suits on the ground that they pose *too great* a threat to the attorney-client relationship." *Gen. Dynamics Corp. v. Superior Court*, 7 Cal. 4th 1164, 1182, 876 P.2d 487, 32 Cal. Rptr. 2d 1 (1994). Accordingly, I would hold that the Karstetters failed as a matter of law to state a wrongful discharge claim for which relief can be granted.

The majority purports to circumscribe its ruling by allowing terminated in-house counsel attorneys to bring contract and wrongful discharge suits "provided these suits can be brought without violence to the integrity of the attorney-client relationship." Majority at 2. How such a parameter will be enforced, however, remains unclear. Thirty-five years ago, this court saw fit to eliminate *any* such risk to the integrity of the attorney-client relationship when it promulgated RPC 1.16 as part of the RPCs. Contrary to the majority's stark characterization of the time period from which the RPCs hail, 1985 can hardly be considered the Victorian Era. Rather, the underlying policy concerns and objectives of RPC 1.16—ensuring trust and loyalty between attorneys and clients, and mitigating the inevitable power differential— remain as relevant today as ever.

In the majority's view, in-house attorneys are simply different and thus deserve different treatment under the law. Never before, however, has an exception to RPC

3

1.16 been enunciated for any subset of attorneys. Though this court possesses authority to promulgate, interpret, and enforce the RPCs, *Hizey v. Carpenter*, 119 Wn.2d 251, 261, 830 P.2d 646 (1992), pronouncement via judicial opinion is not the preferred method for amending them. *See In re Disciplinary Proceeding Against Haley*, 156 Wn.2d 324, 346-47, 126 P.3d 1262 (2006) (Sanders, J., concurring) ("If we conclude that [a rule needs to be changed], we should simply rewrite the rule . . . . Lawyers should not have to read slip opinions to divine their professional obligations."). When it comes to carving out a dramatic new exception to the RPCs, best practice would be to engage in rulemaking, which provides due notice through publication of proposed rules and opportunity for public comment. GR 9(g). Modifying the mandate of RPC 1.16 through this case undermines both the purpose and spirit of rulemaking.

Though I do not extol the Guild for capitalizing on the mandate of RPC 1.16 after 20 years of complicity in contracts establishing mutual expectations of security in Karstetter's position, the onus was nevertheless on Karstetter as a licensed Washington attorney to know and uphold the rules governing attorney conduct. I would not grant him an equitable exemption after the fact, as the majority elects to do. I respectfully dissent.

Owens, J.

Johnson

George M Cald, Jr

*Karstetter et ux v. King County Corr. Guild et al.*, No. 95531-0
Owens, J., Dissenting

5