

DA 06-0566

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 79

SANTANA N. KORTUM-MANAGHAN,

        Plaintiff and Appellant,

    v.

HERBERGERS NBGL, HERBERGERS HB,
HOUSEHOLD/HERBERGERS, and
SAKS INCORPORATED,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and For the County of Flathead, Cause No. DV 2004-635A
                Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                William L. Managhan, Managhan & Kortum-Managhan Law Firm,
                PLLC, Kalispell, Montana

        For Appellee:

                Kimberly S. More, Crowley, Haughey, Hanson, Toole & Dietrich,
                PLLP, Kalispell, Montana

                Leonard H. Smith, Crowley, Haughey, Hanson, Toole & Dietrich,
                PLLP, Billings, Montana

Submitted on Briefs:  June 13, 2007

Decided:  March 17, 2009

Filed:

_____
                    Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Santana Kortum-Managhan appeals an order of the District Court for the Eleventh Judicial District, Flathead County, granting a motion to dismiss and to compel arbitration filed by Herbergers NBGL, Herbergers HB, Household/Herbergers, and Saks Incorporated (collectively, Herbergers). We reverse and remand for further proceedings consistent with this Opinion.

¶2    Kortum-Managhan raises the following issues on appeal:

¶3    1. Can a credit issuer require a consumer to take affirmative action to avoid being deemed to have accepted a substantial change in the parties' original agreement which adds a binding arbitration clause?

¶4    2. Is a credit card "bill stuffer" sufficient notice to cause a consumer to knowingly and intelligently waive her fundamental constitutional right to a jury trial?

¶5    Because we find Kortum-Managhan's second issue to be dispositive of this case, we do not address her first issue.

**Factual and Procedural Background**

¶6    Kortum-Managhan opened an account with Herbergers in October 1998 after a Herbergers' employee asked her if she wanted to save 10% on her purchase by filling out an application for a Herbergers' credit card. The application did not include the terms and conditions of the agreement, and Kortum-Managhan later alleged that she never signed any agreement that included the terms and conditions for the use of her Herbergers' credit account.

2

¶7 Kortum-Managhan subsequently received by mail her Herbergers' credit card, issued by the National Bank of the Great Lakes, and a Revolving Credit Card Agreement pertaining to her Herbergers' credit card. This agreement did not include an arbitration clause. However, it did contain a provision purporting to allow Herbergers to unilaterally change the agreement as it saw fit and specifying that a cardholder's continued use of their Herbergers' credit card or other services constituted agreement to Herbergers' unilateral change in terms:

> 12. Change in this Agreement: *The Card Issuer may at any time change any term of this Agreement*, including the rate of FINANCE CHARGE, as long as the Card Issuer gives you notice of the change as required by applicable law. Any new term may, at the option of the Card Issuer, apply to unpaid balances as well as future balances to the extent permitted by applicable law. If you do not agree to the change, you may terminate this Agreement; however, you will continue to be obligated to pay any outstanding balance on your Account in accordance with the terms of this Agreement. *Your use of your Account to obtain credit after the effective date of the change will constitute your acceptance of the change for both unpaid and future balances as of the effective date of the change.* We may assign this Agreement or any of our rights under it without prior notice or your consent. [Emphasis added.]

¶8 On September 24, 2004, Kortum-Managhan filed a Complaint against Herbergers alleging multiple violations of the Federal Fair Debt Collection Practices Act and the Montana Unfair Trade Practices and Consumer Protection Act. Kortum-Managhan alleged in her Complaint that Herbergers reported to the various credit bureaus that she had several accounts with Herbergers and its affiliates when, in reality, she had only one account. She maintained that this inaccurate reporting on Herbergers' part negatively impacted her credit score and that her application for admittance to the State Bar of Montana was impeded.

¶9 On February 11, 2005, Herbergers moved to dismiss Kortum-Managhan's Complaint and compel arbitration of the claims. Herbergers alleged that it mailed out a notice of change in terms to Kortum-Managhan in October 1999 along with her monthly statement. This "bill stuffer" contained various changes in the terms of the agreement including the addition of the following arbitration clause:

> 18. **Arbitration for Disputes—No Jury Trials or Class Actions:** This paragraph 18 describes how all Claims . . . will be arbitrated instead of litigated in court.
>
> .  .  .
>
> B. We OR you have the right to require that each Claim be resolved by arbitration. A Claim will be arbitrated if (a) both we and you or (b) either we or you, exercise the right to require that a Claim be arbitrated. If, for example, we exercise our right to require that a Claim be resolved by arbitration but you do not also exercise your right to require that the Claim be arbitrated, the Claim *will* be resolved by arbitration. . . .
>
> C. If we or you request arbitration of a Claim, we and you will not have the right to litigate the Claim in court. This means (1) there will be no jury trial on the Claim, (2) no pre-arbitration discovery except as the Rules permit, and (3) no Claim may be arbitrated on a class-action basis, and neither we nor you will have the right to participate as a representative or member of any class of claimants pertaining to any Claim subject to arbitration. Generally, the arbitrator's decision will be final and binding. There are other rights that you would have if you went to court that also may not be available in arbitration.

Based on the foregoing, Herbergers argued that Kortum-Managhan agreed to binding arbitration through her continued use of her account after Herbergers notified her of the addition of the arbitration provision to her agreement.

¶10 Kortum-Managhan opposed Herbergers' motion to compel arbitration arguing that she did not agree to arbitrate all disputes with Herbergers and that she did not knowingly and intelligently waive her fundamental constitutional rights to trial by jury and to access

4

to the courts. She asserted that she either did not receive the change in terms or she did not notice the change in terms "because [Herbergers] is continually stuffing [her] monthly billing statement with copious piles of junk mail" that she routinely throws away without reading. Thus, Kortum-Managhan argued that she was never advised, in any meaningful way, that she was waiving her fundamental constitutional rights to a jury trial and to access to the courts by her continued use of her Herbergers' credit card.

¶11 On July 10, 2006, the District Court granted Herbergers' motion to compel arbitration and dismissed the action. In its order granting the motion, the court concluded that Kortum-Managhan's continued use of her account after Herbergers notified her of the change in terms constituted an agreement to arbitrate and to waive her right to a jury trial. It is from this order that Kortum-Managhan appeals.

**Standard of Review**

¶12 Our review of a district court's decision to compel arbitration is de novo. *Martz v. Beneficial Montana, Inc.*, 2006 MT 94, ¶ 10, 332 Mont. 93, 135 P.3d 790; *Hubner v. Cutthroat Communications, Inc.*, 2003 MT 333, ¶ 4, 318 Mont. 421, 80 P.3d 1256; *Iwen v. U.S. West Direct*, 1999 MT 63, ¶ 17, 293 Mont. 512, 977 P.2d 989. Moreover, when reviewing a district court's dismissal of an action based upon a motion to arbitrate, we take all allegations of fact by the nonmoving party as true. *Kingston v. Ameritrade, Inc.*, 2000 MT 269 ¶ 9, 302 Mont. 90, 12 P.3d 929 (citing *Hilands Golf Club v. Ashmore*, 277 Mont. 324, 328, 922 P.2d 469, 472 (1996)).

**Discussion**

¶13     *Is a credit card "bill stuffer" sufficient notice to cause a consumer to knowingly and intelligently waive her fundamental constitutional right to a jury trial?*

¶14     Kortum-Managhan contends on appeal that the District Court erred in granting Herbergers' motion to arbitrate because Kortum-Managhan did not knowingly and intelligently waive her fundamental constitutional rights to trial by jury and to access to the courts simply because she continued to use her Herbergers' credit card.  She asserts that a "bill stuffer" containing changes in terms to an agreement and the addition of new terms is not sufficient notice of those changes and additions.

¶15     This Court has consistently determined that, in general, arbitration agreements between parties are valid and enforceable.  *Burkhart v. Semitool, Inc.*, 2000 MT 201, ¶ 15, 300 Mont. 480, 5 P.3d 1031 (citing § 27-5-114, MCA).  Moreover, "[a] district court may not decide the merits of a case when a valid agreement requires the parties to a dispute to submit to arbitration."  *Ratchye v. Lucas*, 1998 MT 87, ¶ 26, 288 Mont. 345, 957 P.2d 1128.  However, when a district court compels arbitration, the threshold inquiry is whether the parties agreed to arbitrate.  *Zigrang v. U.S. Bancorp Piper Jaffrey, Inc.*, 2005 MT 282, ¶ 8, 329 Mont. 239, 123 P.3d 237.

¶16     We held in *Hubner* that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' "  *Hubner*, ¶ 17 (quoting *Ratchye*, ¶ 14); *accord First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 1924 (1995).  We also stated in *Hubner* that "[a]cceptance or consent by the party against whom the contract is sought to be enforced is required before a contract is enforceable."  *Hubner*, ¶ 21 (citing § 28-2-102(2), MCA).

6

¶17 The Federal Arbitration Act (FAA) (9 U.S.C. §§ 1-16) governs contracts involving commerce that contain arbitration clauses. *Thompson v. Lithia Chrysler Jeep Dodge*, 2008 MT 175, ¶ 12, 343 Mont. 392, 185 P.3d 332 (citing *Martz,* ¶ 12). Federal policy favors arbitration and places arbitration agreements on equal footing with all other contracts. *Thompson*, ¶ 12 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S. Ct. 1204, 1207-08 (2006)). The FAA does not pre-empt Montana law when an arbitration clause is at issue. Under 9 U.S.C. § 2 of the FAA, "state law may be applied '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.' " *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-87, 116 S. Ct. 1652, 1656 (1996) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S. Ct. 2520, 2527 n. 9 (1987)) (emphasis in original). Therefore, in Montana, the enforcement of an arbitration clause is a question of Montana contract law. *Iwen*, ¶ 26.

¶18 All contracts must contain four essential elements: (1) identifiable parties capable of contracting; (2) their consent; (3) a lawful object; and (4) consideration. *Keesun Partners v. Ferdig Oil Co., Inc.*, 249 Mont. 331, 337, 816 P.2d 417, 421 (1991) (citing § 28-2-102, MCA). We stated in *Keesun*:

> There must be mutual assent or a meeting of the minds on all essential terms to form a binding contract. Consent is established when there has been an offer and an acceptance of that offer. More specifically, this Court has stated that in order to effectuate a contract there must be not only a valid offer by one party, but also an unconditional acceptance, according to its terms, by the other.

*Keesun*, 249 Mont. at 337, 816 P.2d at 421 (internal citations omitted). Similarly, in

7

*Douglas v. U.S. Dist. Court for Cent. Dist. Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007), *cert. denied by Talk Am, Inc. v. Douglas*, ___ U.S. ___, 128 S. Ct. 1472 (2008), the Ninth Circuit Court of Appeals concluded that

> a party can't unilaterally change the terms of a contract; it must obtain the other party's consent before doing so. This is because a revised contract is merely an offer and does not bind the parties until it is accepted. And generally an offeree cannot actually assent to an offer *unless he knows of its existence*. [Emphasis added and internal citations and quotation marks omitted.]

¶19　In *Myers v. MBNA America*, 2001 WL 965063, 2001 U.S. Dist. LEXIS 11900 (D.Mont. 2001), a case factually similar to the instant case, MBNA attempted to add an arbitration clause to the parties' existing agreement by mailing out a change in terms with continued use of the credit account constituting acceptance. MBNA argued that the arbitration clause was valid and enforceable because the cardholder agreed to allow such amendments when she accepted a credit card and credit line. *Myers*, at 2. However, the United States District Court for the District of Montana reasoned that under MBNA's line of argument, MBNA could amend its agreement to include a provision taking a security interest in the cardholder's home or requiring the cardholder to pay a penalty if she failed to convince three friends to sign up for MBNA cards. *Myers*, at 5. "Such provisions were as much within the agreement of the parties at the outset of their relationship as the arbitration provision." *Myers*, at 5. Consequently, the United States District Court concluded that the cardholder had not accepted MBNA's offer to arbitrate their disputes, thus the arbitration provision could not be enforced against the cardholder. *Myers*, at 5.

8

¶20 Similarly, in *Badie v. Bank of America*, 79 Cal. Rptr. 2d 273 (1998), the California Court of Appeals held that a credit issuer cannot impose binding arbitration on its cardholders via a "bill stuffer" stating that continued use of the card constitutes acceptance. The Court of Appeals determined in *Badie* that a "bill stuffer" imposing a change in terms that takes away an individual's right to a jury trial is fundamentally different than imposing a change in the interest rate, late charges, or other terms.

> Where . . . a party has the unilateral right to change the terms of a contract, it does not act in an "objectively reasonable" manner when it attempts to "recapture" a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into. That is particularly true where the new term deprives the other party of the right to a jury trial and the right to select a judicial forum for dispute resolution.

*Badie*, 79 Cal. Rptr. 2d at 284 (internal citations omitted).

¶21 In addition, the Court of Appeals determined in *Badie* that the credit issuer's unilateral right to change the terms of the parties' agreement was constrained by the implied covenant of good faith and fair dealing. *Badie*, 79 Cal. Rptr. 2d at 284. The court concluded that when the account agreements in that case were entered into, the parties did not intend that the change of terms provision should allow the credit issuer to add completely new terms, such as binding arbitration, simply by sending out a notice. *Badie*, 79 Cal. Rptr. 2d at 289.

¶22 In the instant case, Herbergers points out in its brief on appeal that while Montana has not yet determined whether a revolving credit agreement can be changed to include, as a term of the agreement, a provision requiring arbitration of disputes, this Court did

9

address a modification to interest rates in *Shimsky v. Valley Credit Union*, 208 Mont. 186, 192, 676 P.2d 1308, 1311 (1984), and held that agreements with provisions that allow for future modification of the agreement are enforceable. However, unlike the instant case involving the consumer's rights to trial by jury and access to the courts, *Shimsky* involved merely a change in the interest rate, thus it is distinguishable from the case before us on appeal. "There is a clear distinction between amending the financial terms and rates of a credit card agreement and the unilateral addition of [a] new provision not contemplated at the time of the original agreement." *Discover Bank v. Shea*, 827 A.2d 358, 365 (2001). As was the case in *Badie*, the original agreement between Kortum-Managhan and Herbergers stated that the "Card Issuer may at any time *change* any term of this Agreement . . . (emphasis added)." The agreement did not contemplate the addition of completely new terms and conditions, and most certainly not a provision that waived the cardholders' rights to trial by jury and to access to the courts.

¶23    The agreement in this case is a contract of adhesion. "Contracts of adhesion arise when a party possessing superior bargaining power presents a standardized form of agreement to a party whose choice remains either to accept or reject the contract without the opportunity to negotiate its terms." *Zigrang, ¶* 14 (citing *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 24, 310 Mont. 123, 54 P.3d 1, *cert. denied*, 538 U.S. 956, 123 S. Ct. 1633 (2003)). "Generally applicable contract law states that an adhesion contract will not be enforced against the weaker party if it is (1) not within their reasonable expectations, or (2) within their reasonable expectations, but, when considered in its context, proves unduly oppressive, unconscionable or against public policy." *Zigrang*, ¶ 13 (citing *Iwen*,

¶ 27). Clearly, the addition of an arbitration clause in the instant case was not within Kortum-Managhan's reasonable expectations.

¶24 In its Order and Rationale on Motion to Compel Arbitration, the District Court noted that "[a] party is free to contract away the right to a jury trial." However, the court failed to recognize that waiving that right must be done voluntarily, knowingly and intelligently.

¶25 This Court has repeatedly held that the rights enumerated in the Declaration of Rights (Article II) of Montana's Constitution are fundamental constitutional rights. *Yellowstone County v. Billings Gazette,* 2006 MT 218, ¶ 37, 333 Mont. 390, 143 P.3d 135 (citing *State v. Tapson,* 2001 MT 292, ¶ 15, 307 Mont. 428, 41 P.3d 305); *accord Walker v. State,* 2003 MT 134, ¶ 74, 316 Mont. 103, 68 P.3d 872; *Gryczan v. State,* 283 Mont. 433, 449, 942 P.2d 112, 122 (1997). And, contrary to Herbergers' assertions in its brief on appeal, the rights to trial by jury (Article II, § 26) and access to the courts (Article II, § 16) are fundamental constitutional rights that deserve the highest level of court scrutiny and protection. *Kloss,* ¶ 52 (Nelson, Cotter, Leaphart & Trieweiler, JJ., specially concurring).

¶26 Arbitration clauses, by their very nature, waive a consumer's fundamental constitutional rights to trial by jury, access to the courts, due process of law and equal protection of the laws. *Kloss,* ¶ 48 n. 1 (Nelson, Cotter, Leaphart & Trieweiler, JJ., specially concurring). Thus, the waiver of a fundamental constitutional right must be proved to have been made voluntarily, knowingly and intelligently. *Kloss,* ¶ 64 (Nelson, Cotter, Leaphart & Trieweiler, JJ., specially concurring). In his specially concurring

11

Opinion in *Kloss,* Justice Nelson stated, and a majority of the Court agreed, that for a fundamental right to be effectively waived, a consumer must be informed of the consequences before personally consenting to the waiver; waiver of a fundamental right would not be lightly presumed. *Kloss,* ¶ 64 (Nelson, Cotter, Leaphart & Trieweiler, JJ., specially concurring). In addition, the contractual waiver of fundamental constitutional rights "must be *deliberately* and understandingly made . . . ." *Kloss,* ¶ 74 (Nelson, Cotter, Leaphart & Trieweiler, JJ., specially concurring) (emphasis added) (quoting *May v. Figgins,* 186 Mont. 383, 394, 607 P.2d 1132, 1138-39 (1980)).

¶27 In determining whether an individual deliberately, understandingly and intelligently waived their fundamental constitutional rights to trial by jury and access to the courts, a majority of this Court concluded in *Kloss* that courts should consider the totality of the following factors:

> whether there were any actual negotiations over the waiver provision; whether the clause was included on a take-it-or-leave-it basis as part of a standard-form contract; whether the waiver clause was conspicuous and explained the consequences of the provision (e.g. waiver of the right to trial by jury and right of access to the courts); whether there was disparity in the bargaining power of the contracting parties; whether there was a difference in business experience and sophistication of the parties; whether the party charged with the waiver was represented by counsel at the time the agreement was executed; whether economic, social or practical duress compelled a party to execute the contract (e.g. where a consumer needs phone service and the only company or companies providing that service require execution of an adhesion contract with a binding arbitration clause before service will be extended); whether the agreement was actually signed or the waiver provision separately initialed; whether the waiver clause was ambiguous or misleading; and whether the party with the superior bargaining power lulled the inferior party into a belief that the waiver would not be enforced.

*Kloss,* ¶ 65 (Nelson, Cotter, Leaphart & Trieweiler, JJ., specially concurring).

¶28 In applying each of these factors to the facts in the case before us on appeal, Kortum-Managhan points out that there were no negotiations over the arbitration provision. Herbergers merely included that provision within a monthly billing statement along with "copious piles of junk mail." This "bill stuffer" was a take-it-or-leave-it part of Herbergers' form contract. Kortum-Managhan's only options were to either waive her right to access to the courts and trial by jury, or to discontinue use of the credit card. In addition, the arbitration provision in this agreement is not conspicuous. Other paragraphs in the agreement use a larger font, capital letters and bold type to set them apart, while the arbitration provision does not.

¶29 Kortum-Managhan asserts in her brief that she was not represented by counsel at the time Herbergers sent out the "bill stuffer." She fails to mention, however, that she is an attorney, or at least, at that time, was in the process of becoming an attorney. However, Kortum-Managhan correctly asserts that there is a huge disparity in the bargaining power between herself and Herbergers, and that Herbergers has extremely more business experience and sophistication than a common consumer.

> Banks . . . have immense power over their credit card customers. [They] can effectively destroy the cardholder's credit standing and ability to obtain future credit by mailing negative credit comments about the cardholder to the major reporting agencies.

*Discover*, 827 A.2d at 368.

¶30 Kortum-Managhan also points out that Herbergers used economic and practical duress in its attempt to compel her to imply agreement to the arbitration provision

through continued use of her Herbergers' credit card. She maintains that she not only did not sign Herbergers' unilateral change in terms, she has never seen it.

¶31 The "bill stuffer" in this case is ambiguous and misleading because it seeks to waive the cardholder's fundamental constitutional rights with a clause blended into the end of a document when bold type, capital letters and larger fonts are used to draw attention to other clauses. Kortum-Managhan asserts, and we agree, that Herbergers, through the use of the "bill stuffer," attempted to lull her into agreeing to waive her constitutional rights and that attempting to change the terms of a contract through the use of a "bill stuffer" is "sneaky and unfair."

¶32 Along those same lines, the court in *Badie* pointed out regarding the "bill stuffer" in that case,

> [i]n short, the language of the "bill stuffer," as well as the method used to disseminate it, suggests that it was designed to downplay the true significance of the [credit issuer's arbitration provision], and to reduce the likelihood that customers would notice and object to the new provision.

*Badie*, 79 Cal. Rptr. 2d at 291.

¶33 In its brief on appeal, Herbergers cites to six cases from other jurisdictions which Herbergers claims have consistently determined that a change in terms to add an arbitration clause after the original agreement was entered into are effective. However, only one of these cases, *Marsh v. First USA Bank, N.A.*, 103 F. Supp. 2d 909 (N.D. Tex. 2000), is factually similar to the instant case. The remaining cases are distinguishable.

¶34 In both *Bank One, N.A. v. Coates*, 125 F. Supp. 2d 819 (S.D. Miss. 2001), and *Herrington v. Union Planters Bank, N.A.*, 113 F. Supp. 2d 1026 (S.D. Miss 2000), cited

14

by Herbergers, there is no mention of the change of terms containing the arbitration agreement being sent to the consumer as a "bill stuffer." Indeed, *Herrington* specifically states that the consumer was mailed a letter along with a copy of the revised agreement. *Herrington*, 113 F. Supp. 2d at 1028. Furthermore, in *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574 (W.D.N.C. 2000); *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997), *cert. denied*, 522 U.S. 808, 118 S. Ct. 47 (1997); and *Stiles v. Home Cable Concepts, Inc.*, 994 F. Supp. 1410 (M.D. Ala. 1998), also cited by Herbergers, the consumer in each case admitted receiving the change in terms containing the arbitration agreement. And, finally, in *Marsh*, although the notice of the change of terms which included the arbitration agreement was sent to the consumer as a "bill stuffer," the court in that case determined that First USA Bank submitted ample evidence, unrefuted by the consumer, indicating that there was very little chance that the consumer would not have received the information or would not have noticed the information in their monthly bill. *Marsh*, 103 F. Supp. 2d at 916-19.

¶35 Based on the foregoing, we conclude that making a change in a credit agreement by way of a "bill stuffer" does not provide sufficient notice to the consumer on which acceptance of the unilateral change to a contract can be expressly or implicitly found. Consequently, Herbergers' unilateral attempt to amend its original cardholder agreement to include an arbitration clause was ineffective.

¶36 Accordingly, we hold that the District Court erred in granting Herbergers' motion to compel arbitration and to dismiss.

¶37    Reversed and remanded for entry of an order vacating the court's order compelling arbitration, for entry of an order reinstating Kortum-Managhan's cause of action, and for further proceedings consistent with this Opinion.


/S/ JAMES C. NELSON


We Concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS


Justice Jim Rice, dissenting.

¶38    "This case serves as a reminder that people should read their mail—especially when it comes from their credit card companies." *Hutcherson v. Sears Roebuck & Co.*, 793 N.E.2d 886, 887 (Ill. App. 2003).

¶39    Indeed.  It is very common in today's world for credit card companies to make changes to agreements with their customers, sending out notices of such changes with the customers' monthly bills.  This is done pursuant to the specific authority granted to the companies to do so under the original agreement, as was granted here.  Kortum-

16

Managhan consented to this unilateral process of contract modification when she agreed to the original terms of the credit agreement, which granted Herbergers permission, "at any time," to "change any term of [the] agreement" and provide notice of any changes.[1] The original agreement further provided that Kortum-Managhan, by her continued use of the card, would accept the new terms. Kortum-Managhan admits that she received the original Revolving Credit Agreement via mail, that the terms of the agreement permitted Herbergers to unilaterally modify their agreement and notify her of the changes in the same manner as it did originally, via mail, and that she used the card pursuant to this agreement.

¶40    It is well established that a person who signs a contract is presumed to know its terms and agree to be bound by them. Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* 27, § 70:113 (4th ed., West 2003). It follows that Kortum-Managhan had a duty to read the notices Herbergers mailed to her regarding alterations to her contract, just as she had a duty to read the contract's original terms, or risk the consequences created by her failure to do so.

¶41    Over twenty-five years ago, our decision in *Shimsky* cautioned customers of the potential consequences of failing to read correspondence from their creditor. 208 Mont. 186, 676 P.2d 1308. Approximately six months after Shimsky took out a loan and entered into an open ended revolving credit plan with Valley Credit Union, Valley changed the terms of the credit agreement. Valley mailed Shimsky a notice of the

---

[1] The District Court determined that "[w]hen Plaintiff entered into the original agreement she also agreed that Defendant could provide her with notices to the address listed on the application."

17

change, which was an increase in his finance rate. Thereafter, Shimsky continued to make payments to Valley, but later asserted he did not realize the finance rate had been changed. Shimsky brought suit, claiming Valley had breached its agreement by unilaterally raising the interest rate. We decided the case upon principles of equity, concluding that, because Shimsky had continued to make payments and otherwise remain compliant with the terms of the modified agreement without objection to the changes, Valley had relied upon Shimsky's apparent acquiescence and it would be inequitable to allow Shimsky to pursue his claim. *Shimsky*, 208 Mont. at 192, 676 P.2d at 1311. Shimsky's failure to read his mail, coupled with his prolonged silence and compliance, bound him to the change in contract terms the creditor had made.

¶42 Kortum-Managhan criticizes the notice regarding the arbitration clause because Herbergers mailed it with "copious piles of junk mail," such as "Paris Hilton endorsed products." However, when Kortum-Managhan became part of an agreement under which Herbergers could unilaterally make changes and send notice of those changes, that contractual authority was not qualified by a requirement that notices be sent in a separate envelope. Clearly, Kortum-Managhan should not be able to escape her duty to read legal notices by way of her assertion that "she routinely throws away the junk mail without reading it."

¶43 The Court devotes much of its opinion applying ideas presented in Justice Nelson's concurring opinion in *Kloss*. However, we previously explained that this concurrence did not create law independent from the Court's holding in *Kloss*. *Larsen v. Western States Ins. Agency, Inc.*, 2007 MT 270, ¶ 19, 339 Mont. 407, 170 P.3d 956 ("We

18

did not recognize an independent separate analysis of arbitration clauses in the concurring opinion in *Kloss*.").

¶44 The Court discounts the six cases cited by Herbergers, wherein courts have upheld a company's unilateral change in contract terms, by reasoning that, in these cases, the courts found the customer had received notice of the changes to their respective contracts. Opinion, ¶¶ 33-34. However, the Court's attempt to distinguish these cases runs counter to the District Court's determination that Kortum-Managhan *had* received notice. The District Court in this case heard evidence that Herbergers sent a notice of the change to Kortum-Managhan, and despite Kortum-Managhan's assertion that she "may" have discarded the notice, the court ultimately found she had received it.

¶45 While Article II, Section 26 of the Montana Constitution provides a right to a jury trial, every individual enjoys the fundamental freedom to contract, which allows parties to craft terms governing their private conduct. *Arrowhead Sch. Dist. No. 75 v. Klyap* 2003 MT 294, ¶ 20, 318 Mont. 103, 79 P.3d 250; *see also Gibbons v. Huntsinger*, 105 Mont. 562, 573, 74 P.2d 443, 449 (1937) ("[f]reedom of contract is one of the fundamental liberties of the individual"). Parties are free to contractually waive individual rights as they deem appropriate. A court may not re-write the terms of a contract, but must enforce the contract as the parties intended. *Stutzman v. Safeco Ins. Co. of America*, 284 Mont. 372, 376, 945 P.2d 32, 34 (1997).

¶46 Further, arbitration clauses in contracts are valid even in contracts of adhesion, if the clause is within the reasonable expectation of the weaker party and is not unduly oppressive, unconscionable, or against public policy. *Iwen v. U.S. West Direct*, 1999 MT

19

63, ¶ 27, 293 Mont. 512, 977 P.2d 989 (quoting *Passage v. Prudential-Bache Securities, Inc.* 223 Mont. 60, 66, 727 P.2d 1298, 1302 (1986)). If it was objectively reasonable to expect a change to the agreement which would add an arbitration requirement, then Kortum-Managhan's continued use of the card after having been provided notice of that change establishes her assent to the new term, provided the term was not oppressive, unconscionable, or contrary to public policy. However, Kortum-Managhan has not asserted that the change to the contract requiring arbitration was not within her reasonable expectations when she agreed that changes could be made unilaterally, nor that the term was oppressive or unconscionable. As the District Court noted, "Plaintiff has *presented no evidence* that an arbitration provision was not within the reasonable expectations of the Plaintiff or that the provision to arbitrate is unduly oppressive, unconscionable, or against public policy." (Emphasis added.)

¶47 Thus, Kortum-Managhan entered an agreement with Herbergers which included a unilateral change-and-notify procedure, Herbergers acted according to this provision and added an arbitration clause, Kortum-Managhan failed to read the subsequent notice, and thereafter continued to accept the benefits of the parties' agreement by using the card. She did not establish in the District Court that this contract change was beyond her expectations or unconscionable. Rather, she asks the Court to ignore her entering an agreement that included a change-and-notify procedure, excuse her discarding of what, in her opinion, was "junk mail" from the company, and undertake review of waiver analysis in a vacuum. Because I believe the contract terms cannot be ignored, nor Kortum-Managhan's conduct excused, and because she did not present evidence to support

20

"reasonable expectation" and "unconscionable" defenses, I would affirm the District Court.

/S/ JIM RICE