
DA 09-0291

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 457N

MOUNTAIN SUPPLY COMPANY,

Plaintiff and Appellee,

v.

ELGIN FORBES,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV 06-534
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Justin Starin and Charles J. Tornabene; Tornabene & McKenna, PLLC;
Missoula, Montana

For Appellee:

Jeffrey T. Dickson and Kevin S. Jones; Christian, Samson & Jones, PLLC;
Missoula, Montana

Submitted on Briefs: September 23, 2009

Decided: December 31, 2009

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, as amended in 2006, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and its case title, Supreme Court cause number and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     Elgin Forbes (Forbes) appeals from an order of the Fourth Judicial District Court, Missoula County, awarding judgment and costs to Mountain Supply Company (Mountain Supply). We affirm in part and reverse in part.

¶3     We review the following issues on appeal:

¶4     *Did the District Court properly conclude that a valid and enforceable contract existed between Mountain Supply and EF Unlimited?*

¶5     *Did the District Court properly conclude that the amount of the credit line was "unlimited" at the time of execution?*

¶6     *Did the District Court properly conclude that Forbes was jointly and severally liable for EF Unlimited's debt?*

FACTUAL AND PROCEDURAL BACKGROUND

¶7     Forbes formed EF Unlimited, LLC (EF), on April 12, 2004, with its principal place of business in Darby, Montana. Forbes was the sole member of EF, and his son-in-law, David Blanchard (Blanchard), was the sole manager. Forbes and Blanchard formed EF to provide Blanchard with a source of income to support his family. Forbes testified that he provided

2

the capital and credit as Blanchard earlier had declared bankruptcy. EF began as a snow removal business and expanded into landscaping with the change in seasons.

¶8 Mountain Supply sells and distributes irrigation supplies. Shortly after forming EF, Forbes filled out a Credit Application and Agreement (Agreement) seeking a line of credit with Mountain Supply. Forbes wrote a question mark in the box captioned "Amt of Credit Requested." Forbes wrote the question mark because he "didn't know what credit line they would be attempting." Forbes signed the form in two separate spaces, one in his individual capacity, and one on behalf of EF. The Agreement provided that it was binding jointly and severally on all signatories.

¶9 Jack Reed was the branch manager of Mountain Supply in Missoula, Montana. Reed wrote "2500" in the box labeled "Amt of Credit Requested" on the Agreement that Forbes had submitted. Mountain Supply's policy was to limit new credit accounts to $2,500. Reed did not communicate this fact to Forbes. Reed also did not notify Forbes when Mountain Supply approved the credit line. Reed did notify Blanchard of both the approval and the $2,500 limit on the credit line.

¶10 Forbes acknowledged having signed the Agreement in both his personal capacity and on behalf of EF. Forbes did not remember whether he had read the terms of the Agreement that imposed joint and several liability before he signed it. Forbes testified that he understood that Blanchard would be buying supplies on credit. Forbes later claimed, however, that he did not know whether the credit line had been established. Mountain Supply acknowledged that it did not communicate the approval of the line of credit to

3

Forbes. Forbes acknowledged that he did not check with Mountain Supply to determine whether the line of credit had been approved, and if so, for what amount.

¶11 Blanchard, acting as EF's manager, made purchases on the line of credit. Whether any of the bills were ever sent to Forbes remains a matter of dispute. Forbes could not recall whether any of the bills had been sent to him. Forbes knew that EF had credit arrangements with other suppliers. Forbes acknowledged that he had not received any of EF's bills from those suppliers either. He testified that he assumed Blanchard was "dealing with" the bills.

¶12 Neither Reed nor Blanchard could recall whether any of the bills had been sent to Forbes's personal address in Darby. Both agreed that the initial statement may have been sent to Forbes's home address. Both conceded that all subsequent statements had been sent to EF's business address in Missoula. Blanchard paid the bills regularly for approximately one year. Forbes's daughter wrote the checks.

¶13 Mountain Supply advertised to Blanchard its early-buy program in February of 2005. The early-buy program allowed contractors to purchase large volumes of irrigation products on credit without paying for up to 90 days. Blanchard opted to participate in the program at its highest level and purchased large volumes of supplies. Reed testified that Mountain Supply had decided to increase EF's credit amount in response to its good payment history. Reed acknowledged the casual nature of the arrangement whereby Mountain Supply allowed EF to charge amounts in excess of the $2,500 limit without formally increasing its credit line, or notifying EF of an increase.

4

¶14 Blanchard testified that he informed Forbes of EF's participation in the early-buy program. Forbes denied any knowledge of the early-buy program. EF defaulted on its bill in the early summer of 2005. As of July 2005, EF's outstanding debt stood at approximately $35,000.

¶15 Forbes's daughter informed Forbes in the fall of 2005 that there were some "shady shenanigans" going on with EF. Forbes contacted Mountain Supply and several other suppliers with whom EF had done business. Forbes discovered the amount of EF's debt with Mountain Supply when he met with Reed. Forbes does not recall his reaction to Reed's disclosure, though he claimed to have been "outraged." Reed left the meeting with the impression that "the bill was going to be handled." Forbes testified in his deposition that he would have been willing to pay the $2,500, though he did not know about the credit limit until he had met with Reed. Forbes agreed to pay the $2,500 based on its inclusion in the Agreement.

¶16 Forbes sold EF to Blanchard on November 9, 2005. The Montana Secretary of State dissolved EF involuntarily on December 4, 2006. Mountain Supply sued EF and Forbes for breach of contract. Mountain Supply sought $38,892.29 in damages plus interest, late fees, attorney's fees, and costs.

¶17 The District Court held a one-day bench trial. The court found that a contract existed between Mountain Supply, EF, and Forbes. The court further found that even if a contract did not exist due to lack of consent, EF and Forbes nevertheless had ratified the contract by charging purchases on the account at Mountain Supply and by receiving materials from

5

Mountain Supply. The court awarded Mountain Supply $56,204.93 in principal, late fees, and accrued interest, plus attorney's fees and costs.

## STANDARD OF REVIEW

¶18 We review for clear error a district court's findings of fact. *State v. Clark*, 2009 MT 327, ¶ 10, 353 Mont. 1, 218 P.3d 483. We review for correctness a court's conclusions of law. *Clark*, ¶ 10.

## DISCUSSION

¶19 *Did the District Court properly conclude that a valid and enforceable contract existed between Mountain Supply and EF?*

¶20 A contract represents "an agreement to do or not to do a certain thing." Section 28-2-101, MCA. A valid contract requires identifiable parties, consent of the parties, a lawful object, and a sufficient cause or consideration. Section 28-2-102, MCA. Whether a contract existed between EF and Mountain Supply turns on the issue of whether EF consented to the Agreement.

¶21 Consent must be free, mutual, and communicated by each party to the other. Section 28-2-301, MCA. Consent must be communicated by some act or omission of the party consenting. Section 28-2-501, MCA. A voluntary acceptance of the benefit of a contract is equivalent to consent to the obligations imposed by the contract "so far as the facts are known *or ought to be known* to the person accepting." Section 28-2-503(2), MCA (emphasis added).

6

¶22 Forbes placed a question mark on the "amount" line because he had been unsure how much credit Mountain Supply would be willing to extend to EF. The fact that Forbes left blank the amount of the line of credit at the execution of the Agreement does not automatically render the Agreement void. *See Gazza v. United California Bank International*, 88 A.D.2d 968, 969 (NY, 1982). Reed testified that approximately half of Mountain Supply's customers left the amount line blank. Reed interpreted the question mark to indicate that Forbes simply had been unsure of the amount of credit that Mountain Supply would be willing to extend.

¶23 Consent to a contract "is not mutual unless the parties all agree upon the same thing in the same sense." Section 28-2-303, MCA. In other words, there must be a meeting of the minds between the parties on all essential terms of the contract. *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 18, 349 Mont. 475, 204 P.3d 693. Reed wrote "2500" next to Forbes's question mark in the box on the Agreement. This limit represented the standard amount of credit that Mountain Supply extended to new customers. Reed's need to add the notation confirms that the application submitted by Forbes lacked an essential term. Reed added this essential term to the Agreement in the form of a $2,500 limit. Reed notified Blanchard when Mountain Supply approved the Agreement. Reed also notified Blanchard as to the amount of the credit line. Blanchard, in turn, communicated his consent to the Agreement by using the line of credit.

¶24 The District Court found that a contract existed when the Agreement was executed. The court further determined that even if valid consent was lacking at the time of execution,

Blanchard's actions on EF's behalf were sufficient to ratify the contract. The court correctly pointed out that a contract voidable "solely for want of due consent may be ratified by a subsequent consent." Section 28-2-304, MCA. A party may express the party's intent to ratify in "either an express oral manner or solely by means of personal conduct." *Audit Servs., Inc. v. Francis Tindall Constr.*, 183 Mont. 474, 477, 600 P.2d 811, 813 (1979). Personal conduct may signify an intent to ratify through actions or inactions, such as receiving the benefits of the contract or failing for an unreasonable period of time to rescind the contract. *Wyman v. Wyman*, 208 Mont. 57, 65, 676 P.2d 181, 185 (1984). Reed communicated Mountain Supply's approval and the amount of the line of credit to Blanchard. Blanchard signified EF's valid consent to the Agreement by using the line of credit. Blanchard acted as manager for EF and had actual authority to bind the company. *Youderian Constr. v. Hall*, 285 Mont. 1, 11, 945 P.2d 909, 915 (1997).

¶25 EF received the benefits of the contract. Forbes, as the owner of the company, presumably knew, or should have known, that Blanchard had been making purchases on the line of credit. Likewise, Forbes probably knew or should have known that Blanchard had been paying the bills for those purchases for nearly a year before EF defaulted on its account. Section 28-2-503, MCA. Forbes testified that he "had a good idea" that Blanchard was "dealing with" Mountain supply and that he understood that Blanchard was buying materials on credit. Ignorance of the contents of the contract that EF had ratified through its actions provides no basis for relief from liability. *Johnson v. Estate of Shelton*, 232 Mont. 85, 89, 754 P.2d 828, 830 (1988). The District Court concluded correctly that a contract existed

8

between EF and Mountain Supply. The District Court also concluded correctly that Blanchard, acting on behalf of EF, had ratified the Agreement through his actions in buying goods on credit and paying the bills for those goods. The parties reached a meeting of the minds with respect to the $2,500 credit limit.

¶26 *Did the District Court properly conclude that the amount of the credit line was "unlimited" at the time of execution?*

¶27 We next address the terms of the contract between EF and Mountain Supply. The District Court concluded that the question mark on the Agreement denoted an unlimited line of credit. We agree with the District Court's conclusion that an unlimited line of credit existed between EF and Mountain Supply. We disagree with the District Court's rationale that this unlimited line of credit arose out of the Agreement. The circumstances surrounding the execution of the Agreement do not support an unlimited line of credit. The subsequent actions of EF and Mountain Supply did create, however, an implied contract with an unlimited line of credit.

¶28 Mountain Supply extended an offer to EF to participate in the early-buy program. Blanchard communicated his assent to the offer on behalf of EF by charging amounts significantly in excess of the $2,500 limit. Mountain Supply allowed these charges. The actions of Mountain Supply and EF constitute offer and acceptance by ratification of an implied contract to an unlimited line of credit separate and apart from the written terms of the Agreement. Sections 28-2-103 and 28-2-304, MCA.

9

¶29    The terms of an express contract are stated in words. The terms of the Agreement constituted an express contract and the parties are bound by the $2,500 limit. Section 28-2-103, MCA. An implied contract is one the existence and terms of which are manifested by the conduct of the parties. Section 28-2-103, MCA. EF's actions in entering into the early-buy program at the invitation of Mountain Supply, and charging amounts in excess of the $2,500 credit limit, created a valid implied contract. Under this contract, EF may be held liable for the full amount of its debt incurred after it entered into the early-buy program.

¶30    *Did the District Court correctly conclude that Forbes was jointly and severally liable for EF Unlimited's debt?*

¶31    The Agreement stated that Forbes would be jointly and severally liable for any debt, associated finance charges, and costs and attorney fees incurred through judicial enforcement of the Agreement. Forbes acknowledged that he understood when he signed the Agreement that he was doing so both on behalf of EF and in his individual capacity. Forbes's signature on the Agreement in his individual capacity obligated him to pay the amount of the debt set by the terms of the Agreement and owed by EF. *See Morgan & Oswood Constr. Co., Inc. v. United States Fidelity and Guaranty Co.*, 167 Mont. 64, 68, 535 P.2d 170, 172 (1975).

¶32    Forbes's assumption of personal liability arises solely from the written Agreement. The written Agreement contains the $2,500 credit limit included by Mountain Supply. The parties are therefore bound by the written terms of the Agreement with respect to Forbes's personal liability. *See Westfork Constr. Co. v. Nelcon, Inc.*, 265 Mont. 398, 405, 877 P.2d 481, 485 (1994).

¶33 EF remains liable on the full amount of the debt it incurred under the early-buy program. Forbes, as the sole member of EF, cannot be held personally liable on this debt. Section 35-8-304(1), MCA. Forbes's personal liability is limited to the terms of the written Agreement that he signed in his personal capacity, as well as in his capacity as the sole member of EF.

¶34 The District Court based its determination of joint and several liability on the erroneous conclusion that the Agreement represented a contract for an unlimited credit line. Based on our analysis above, however, Forbes's personal liability is limited to the contractual amount in the Agreement of $2,500 plus interest, late fees, attorney fees, and costs, as determined by the District Court.

¶35 We affirm in part and reverse in part. We remand for further proceedings consistent with this Opinion to allow the District Court to determine the amount of interest, late fees, attorney fees, and costs due to Mountain Supply from Forbes.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM RICE

11